704 A.2d 927

IN THE MATTER OF LESTER T. VINCENTI,
AN ATTORNEY AT LAW.

Argued October 21, 1997—Decided January 9, 1998.

*JoAnn G. Eyler*, Assistant Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics (*Lee A. Gronikowski*, Deputy Ethics Counsel, on the letter brief).

*Lester T. Vincenti* argued the cause pro se.

PER CURIAM.

■ Over the past fourteen years, respondent, Lester T. Vincenti, has been the subject of no fewer than three reported decisions concerning violations of the Rules of Professional Conduct. Several themes run throughout respondent's unique disciplinary history. One is disrespect, even contempt, for judges, lawyers, parties, witnesses, and the judicial process. To characterize his conduct as unprofessional, irrational, intemperate, insolent, arrogant, abusive, insulting, harassing, scurrilous, and misleading—as it has been characterized in his various disciplinary proceedings—is to minimize its impact on the administration of justice.

Respondent is currently under suspension for violations unrelated to the present matter. Nothing in the record inspires confidence that if respondent were to return to practice that his conduct would improve. Given his lengthy disciplinary history and the absence of any hope for improvement, we expect that his assault on the Rules of Professional Conduct would continue. Our

responsibility to the bench, bar, and the public requires that we take final and irrevocable action.

With sedulous dedication to detail, the Special Master and the Disciplinary Review Board (DRB) have documented respondent's transgressions. Both the Special Master and the DRB have recommended that respondent be disbarred. Our independent review of the record leads us to adopt the full opinion of the DRB as our own. In adopting the DRB report, we have omitted supporting references to exhibits and the transcripts. Those omissions have led to the further elimination of some footnotes and the renumbering of others. Subject to those changes, the DRB opinion follows.

This matter was before the Board based on a recommendation for disbarment filed by Special Master Melvin P. Antell, P.J.A.D. (retired and temporarily assigned on recall). The Office of Attorney Ethics ("OAE") filed two complaints in this matter. In Docket No. XIV–95–134E respondent was charged with violations of *RPC* 1.4(b) (failure to explain matter to permit client to make informed decisions), *RPC* 1.5(a) (overreaching), *RPC* 3.1 (asserting a frivolous issue), *RPC* 3.2 (failure to expedite litigation), *RPC* 3.3(a)(1) (making false statement of material fact to a tribunal), *RPC* 3.4(c) (knowingly disobeying a court order), *RPC* 3.4(e) (alluding at trial to irrelevant matters and stating personal opinions as to the justness of a cause and the credibility of a witness), *RPC* 3.5(c) (conduct intended to disrupt a tribunal), *RPC* 4.4 (using means that have no purpose other than to embarrass, delay or burden a third person), *RPC* 7.5(e) (using phrase "Legal Clinic" on letterhead without informing clients of lack of affiliation with a public, quasi-public or charitable organization), *RPC* 8.1(b), in concert with *Rule* 1:20–3(g)(3) (failure to cooperate with a disciplinary authority), *RPC* 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation), and *RPC* 8.4(d) (conduct prejudicial to the administration of justice). In Docket No. XIV–95–406E respondent was charged with a violation of *RPC* 3.2 (failure to expedite litigation) and *RPC* 8.4(d) (engaging in conduct prejudicial to the administration of justice).

Respondent was admitted to the New Jersey bar in 1971. He has an extensive ethics history. In 1983, he was suspended for one year for displaying a pattern of abuse, intimidation and contempt toward judges, witnesses, opposing counsel and other attorneys. He engaged in intentional, reprehensible behavior, including insults, vulgar profanities and physical intimidation, consisting of, among other things, poking his finger in another attorney's chest and bumping the attorney with his stomach and then his shoulder. *In re Vincenti,* 92 *N.J.* 591, 458 *A.*2d 1268 (1983).

In 1989, respondent was again suspended, this time for three months, for challenging opposing counsel and a witness to fight; for using loud, abusive and profane language against his adversary and an opposing witness; and for using racial innuendo on at least one occasion. He also called a deputy attorney general a vulgar name, was extremely abusive toward a judge's law clerk and told her that she was incompetent. *In re Vincenti,* 114 *N.J.* 275, 554 *A.*2d 470 (1989). In 1994, respondent received an admonition for failing to comply with discovery requests in a disciplinary matter, despite repeated requests from the panel chair, and for falsely testifying at the ethics hearing that he had personally served a subpoena, knowing that to be untrue. *In the Matter of Lester T. Vincenti,* Docket No. DRB 94–303 (November 30, 1994).

Finally, effective March 12, 1997, respondent was suspended for one year, with reinstatement conditioned on demonstration of fitness to practice law. His misconduct in that case consisted of violating the recordkeeping provisions of *R.*1:21–6, negligently misappropriating client funds and engaging in conduct intended to disrupt a tribunal. *In re Vincenti,* 147 *N.J.* 460, 688 *A.*2d 582 (1997). He is currently serving that suspension.

There are no ethics matters pending against respondent.

\*     \*     \*     \*     \*     \*     \*     \*

I. *The A.R.S. Matter—Docket No. XIV–95–134E*

The Division of Youth and Family Services ("DYFS") filed a petition in Superior Court to terminate the parental rights of

J.D.,[1] the natural mother of A.R.S. The matter, captioned *In re A.R.S.*, was tried before Judge Gerald B. Hanifan. Barbara Einhorn, an attorney employed by Somerset–Sussex Legal Services, represented J.D., while a Deputy Attorney General ("DAG") represented DYFS. In addition, James Valenti was appointed and served as law guardian for the child, A.R.S.

On September 30, 1991, the first day of the trial, respondent appeared as a "volunteer" to assist Einhorn in her defense of J.D. According to J.D., Einhorn, who was acquainted with respondent, mentioned the termination of parental rights litigation to respondent. He expressed interest in a potential federal lawsuit against DYFS for violating J.D.'s civil rights. Accordingly, respondent's agreed role at the trial was to observe the proceedings to assist him in representing J.D. in the federal litigation. The fee agreement between J.D. and respondent provided that respondent would receive a fee only from the proceeds of the recovery, if any, in the federal litigation. Although not counsel of record, respondent took over the defense, cross-examining the witnesses called by DYFS to testify. The *A.R.S.* matter consumed more than forty trial days between September 1991 and May 1992.

On May 7, 1992, Judge Hanifan entered an order, on his own motion, removing respondent from participation in the case for all matters, including trial appearances, because respondent "ha[d] repeatedly been obstructive of the Judicial Process and violative of the Rules of Professional Conduct, and having caused unnecessary delay by his intrusion in this matter." Shortly thereafter, on May 14, 1992, Judge Hanifan referred the matter to the District X Ethics Committee.[2]

---

[1] In order to preserve the confidential nature of the proceedings [termination of parental rights], initials will be used to identify the parties.

[2] The matter was subsequently transferred to the OAE pursuant to an order entered by the Supreme Court of New Jersey.

During the *A.R.S.* trial, respondent was repeatedly disrespectful to Judge Hanifan. He constantly interrupted the Judge, particularly when he was ruling on objections or motions. For example, respondent interrupted Judge Hanifan by asserting that respondent's purpose in the case "all along has been to get you to correct your mistakes as far as the defense is concerned...." Shortly thereafter, Judge Hanifan attempted to rule that neither respondent nor the DAG could contact a particular expert until his report was completed:

> The Court: It goes for both sides. The only person really can talk—
>
> Mr. Vincenti: Oh, oh certainly, I mean we, we have given so many indications of attempting to interfere with, with D.Y.F.S.'s witnesses all along.
>
> The Court: Counsel, I'm just trying to set it, set it for—
>
> Mr. Vincenti: My, my, my—
>
> The Court:—for Mr. Valenti so he—
>
> Mr. Vincenti:—we must be protected.

Furthermore, respondent accused Judge Hanifan of exhibiting bias and prejudice when the court ruled against respondent:

> Mr. Vincenti: I object to your comments. It shows nothing but prejudice and bias.
>
> The Court: Fine. Fine.
>
> Mr. Vincenti: You make a ruling and then you decide that simply because [the DAG] doesn't like it, you're going to change your ruling. How many times do you think you—
>
> The Court: That's that's—
>
> Mr. Vincenti:—have to do than—
>
> The Court: Counsel—
>
> Mr. Vincenti:—in order to be shown on the record for the Appellate Courts in this State to be biased and prejudiced?

Respondent's defense in the termination of parental rights case was based, in part, on his ill-founded theory that Judge Hanifan, DYFS staff, the witnesses called by DYFS, and the DAG were engaged in a conspiracy to deprive respondent's client, J.D., of her civil and constitutional rights to custody of her child. In this regard, respondent continued his sarcastic and insulting remarks during another objection:

> The Court: Counsel—hang on.
>
> Mr. Vincenti: She doesn't want us to develop the line to prove it because she's involved in the conspiracy.

The Court: Couns—

Mr. Vincenti: I have every right in the world to prove it even to you, Judge.

The Court: Would you. Would you let me speak counsel, please.

Mr. Vincenti: In your bias and prejudice.

The Court: Would you please let me speak?

Mr. Vincenti: I'm done.

The Court: Thank you.

Mr. Vincenti: I have the right to make statements on the record.

During his questioning of witnesses, respondent often asked multi-part questions that the witnesses were not able to answer. When Judge Hanifan requested respondent to repeat the question, the following colloquy occurred:

Mr. Vincenti: I don't know. I think I'm using the English language.

The Court: Counsel, I asked you nicely. Don't argue with me please. Just break it apart.

Mr. Vincenti: I'm not arguing with you.

The Court: That's what it sounds like, counsel.

Mr. Vincenti: Well I'm sorry for that. But that's your misperception, not mine.

Subsequently, Judge Hanifan asked a question of a witness during respondent's cross-examination and the following exchange took place:

Mr. Vincenti: I can't help it if the people in this Courtroom are not able to follow my questioning.... Your [sic] interfering with my conduct of this cross examination.

The Court: Yes. I am. When I, when I get confused—

Mr. Vincenti: And I object to it.

The Court: You can object all you want, counsel.

Mr. Vincenti: I certainly will

The Court: When you, when you can—will you please, counsel. That's—you're being rude now.

Mr. Vincenti: And so are you.

Finally, the following excerpts from the *A.R.S.* trial transcripts demonstrate respondent's disrespect for the court:

The Court: Counsel, your tone is difficult for me to handle on a day to day basis.

Mr. Vincenti: I apologize for that, but your rulings in this case—

The Court: I, well I'm, I'm telling—

Mr. Vincenti:—are beyond belief.

> The Court: Counsel, it's, it's those kind of comments that, that make it difficult for me to process this matter.
>
> Mr. Vincenti: Well then you know what, what remedies you have.
>
> *     *     *     *     *     *     *     *
>
> Mr. Vincenti: Oh, I've had my chance?
>
> The Court: You've had your chance, yes, you did.
>
> Mr. Vincenti: Oh, you permitted her to cut me off to be discourteous—
>
> The Court: Please sit down and be quiet, counsel.
>
> Mr. Vincenti: Objection.
>
> The Court: Fine. I note your objection. Please sit down and be quiet.
>
> Mr. Vincenti: You're biased and prejudiced and you know it.

As stated above, Judge Hanifan was not the only target of respondent's venomous attacks. Respondent's obnoxious demeanor was also directed at opposing counsel, the DAG, and went far beyond aggressive advocacy. Respondent repeatedly accused the DAG of being a liar. For example, when the DAG objected to a statement made by respondent, the following exchange ensued:

> Mr. Vincenti: You're a liar.
>
> The Court: Hang on counsel, please.
>
> Mr. Vincenti: She is nothing but a liar.
>
> The Court: Counsel—
>
> Mr. Vincenti: And if you don't stop it—
>
> The Court: No, counsel, wait—
>
> Mr. Vincenti: You're going to stop me, right?
>
> The Court: No, counsel—
>
> Mr. Vincenti: Very good.
>
> The Court: I think, I think that that's inappropriate behavior which you're just exhibiting.
>
> Mr. Vincenti: Fine, make a note of it.
>
> The Court: I am making a note of it.
>
> Mr. Vincenti: Good.

Respondent also told Judge Hanifan "[T]his woman [the DAG] is out of her mind, Judge." He also insulted her with the remark that "her ignorance is beyond repair, it's monumental." Respondent accused the DAG of having destroyed families in the Superior Court for seventeen years, apparently a reference to the fact that she had represented DYFS for that length of time. In describing

respondent's conduct toward the DAG, the special master found that "he was invariably abusive, insulting and profoundly vulgar."

Respondent's treatment of the State's witnesses was equally obnoxious. He was abusive and tried to intimidate the witnesses, with some success. Respondent personally attacked the witnesses during his unreasonably long and confrontational cross-examinations. He called the witnesses insulting names and belittled the credentials of the expert witnesses.

Dr. Douglas Haymaker, a psychologist, treated J.D.'s son, A.R.S. During cross-examination, when Haymaker did not immediately answer respondent's question, respondent snapped:

> Do you want time to think about it, Doctor? Because I mean there seems to be a habit in this case of witnesses who don't know what to say to simply sit there and think and come up with some cockamamie response to a very serious question. Now I'd like you to answer the question without thinking about it ad nauseam for the next five minutes.

Respondent harassed Haymaker by asking him irrelevant questions, such as whether he was an aficionado of pornography, a militarist and whether he believed in military solutions to political problems. When Haymaker testified that a statement made by A.R.S. could not necessarily be attributed to his foster mother, respondent sarcastically asked, "Oh, it could have come from the froggies or the horsies or some other non-living thing, is that right?" Respondent also accused Haymaker of having a highly selective memory and of being "in cahoots" with the foster parents.

In reply to one of respondent's questions, Haymaker used the word "assume," prompting respondent to interrupt him:

> A. I assume, I assume it was a work similar—

> Q. No, don't make assumptions, I mean that's all you've done so far is make assumptions and speculations and give us your opinions and conclusions. I'm not interested in your opinions and conclusions, speculations or assumptions, Doctor. I'm interested in having you search your memory, think if you can come up with what was stupid, et cetera. Make your best effort, Doctor. It's only a year ago. As a matter of fact, it's not even a year ago. It's eight months ago. That's not such a long time ago. Tell us. I challenge you to tell us.

Respondent's comments were particularly inappropriate because he previously had demanded that Haymaker express his opinions and conclusions.

During the trial, respondent referred to Haymaker as a "liar," "so-called psychologist," "busy body do-gooder" and "so-called therapist." He belittled Haymaker's therapy sessions with A.R.S. as "your so-called game therapy, play therapy so-called." Respondent accused Haymaker of condoning violence, insults to women, pornography and brutality.

Another witness called by DYFS was a social worker. At the request of James Valenti, law guardian for A.R.S., the social worker conducted a bonding evaluation to address the issue of where A.R.S. should reside permanently. The social worker, too, was the victim of harassment and intimidation by respondent. At the ethics hearing, the social worker testified as follows about respondent's courtroom behavior:

> A. The thrust of his questions as I experienced them had less to do with the content than with an attempt to demean me, to ridicule me. I felt the nature of his cross-examination was highly personalized and had very little to do with the content or with trying to uncover the truth of the issues. For example, in the *voir dire*, he took a tremendous amount of time asking me what specific courses I had taken when I was in graduate school. At the time that I testified, I had—it had been fifteen years since I completed my doctorate and over twenty years since I completed my Masters degree. He wanted to know the specific names of the courses I had taken. I said I couldn't remember the specific names, but I could talk about the kinds of courses I took and how they were related to the work that I was doing. He ridiculed me for the fact that I could not remember the course name and went over that over and over again.

Respondent also made insinuations about the social worker's sexual orientation. He suggested that she inappropriately touched his client, J.D., during a bonding-evaluation session with J.D. and A.R.S. Respondent attached significance to the fact that the social worker used purple paper for taking notes in her office, despite her explanation that it was the easiest color for her eyes. Respondent even said that he would bring in an expert to talk about the meaning of using purple paper. Respondent also used sashaying and other body language to question her sexuality. As the social worker testified at the ethics hearing:

The Court: Did he imply what meaning he read into this?

The Witness: My view?

The Court: Yeah.

The Witness: Given his body language, given that it came on the heels of his suggesting that I had touched his client, that there was something about my sexual orientation that was revealed by the colors of the paper and the paper clip, as well. That's why I mentioned the body language, also, that on the heels of all of this and the context within which it was raised, certainly the implication was that there was something about my sexual orientation that he was alluding to.

The Court: Is that what came across to you?

The Witness: Yes absolutely, without question.

In addition, respondent took the social worker's notes from her during her testimony. He then toyed with her, refusing to return the notes. When she asked Judge Hanifan to instruct respondent to return the notes, respondent berated the judge for talking to the witness.

Unfortunately for the social worker, the conclusion of the *A.R.S.* trial did not signal the end of respondent's harassment toward her. About six months after the trial ended, she and Dr. Hagovsky, another witness who had testified in the *A.R.S.* matter, were invited to participate at a conference sponsored by the Association of Trial Lawyers of America. There was no connection between the trial and the conference. However, in a letter to Cary B. Cheifetz, the conference coordinator, respondent contended that the social worker and Hagovsky held "Nazi views" and suggested that it would be helpful if respondent attended the conference to denounce them. Although the letter could not be introduced into evidence because Cheifetz discarded it after receiving it, both Cheifetz and the social worker testified at the ethics hearing about the contents of the letter. While respondent complained that the letter was not produced, he did not deny having sent it.[3]

\*       \*       \*       \*       \*       \*       \*       \*

As stated above, by order dated May 7, 1992, respondent was removed from the *A.R.S.* trial and prohibited from further partic-

---

[3] Respondent did not testify at the ethics hearing.

ipation in it. Respondent immediately filed an emergent motion for leave to appeal the order. On May 12, 1992, the Appellate Division denied the motion. In addition, respondent filed a motion in aid of litigant's rights on short notice with the Assignment Judge of Morris County, Judge Stanton, seeking a mistrial and removal of Judge Hanifan from the litigation. By letter dated May 13, 1992, Judge Stanton summarily denied the motion, explaining that it was filed in the wrong forum. Judge Stanton suggested that any review of Judge Hanifan's decisions be sought in the Appellate Division.

The *A.R.S.* trial was concluded following four trial days subsequent to respondent's removal from the case. Judge Hanifan ruled in favor of DYFS, terminating J.D.'s parental rights. Although respondent did not represent J.D. and was barred from participating in the matter, he filed an emergent application with the Appellate Division seeking review of Judge Hanifan's decision. Judge Arnold M. Stein of the Appellate Division denied respondent's application and ordered respondent not to appear before "this or any other court in connection with this matter." Respondent's subsequent motions for reconsideration of the August 20, 1992, order and for recusal of Judge Stein were denied by the Appellate Division on September 17, 1992.

On September 18, 1992, the Appellate Division administratively dismissed the appeal as improvidently filed. On its own motion, the Appellate Division reinstated the appeal on October 1, 1992, in order to give J.D. the opportunity to prosecute the appeal through other counsel. By letter dated October 19, 1992, Emille Cox, Clerk of the Appellate Division, notified respondent of the court's actions and the reasons therefor. Thus, respondent was aware that he had been directed by the Appellate Division not to appear in any court on behalf of J.D.

Respondent should have notified J.D. of the orders entered by the Appellate Division and should have suggested that she pursue the appeal through Legal Services or other counsel. Instead, respondent filed an appeal with the Supreme Court, as well as a

motion to prohibit the Appellate Division from exercising jurisdiction over the matter. The Court dismissed the appeal and denied the motion. Subsequently, respondent filed yet another application with the Appellate Division, this time a motion in aid of litigant's rights requesting, among other things, that the prior orders of the court barring him from appearing on behalf of J.D. be vacated, that he be named as a party appellant to permit him to appeal Judge Hanifan's order barring him from participating in the matter and that the *A.R.S.* trial transcripts be prepared at public expense. By order of January 14, 1993, the Appellate Division denied respondent's motion. In light of respondent's refusal to amend the notice of appeal to address only the May 7, 1992, order barring him from appearing on behalf of J.D., the Appellate Division dismissed the appeal.

Respondent filed another notice of appeal and a motion in aid of litigant's rights with the Supreme Court. The record does not contain an order from the Supreme Court disposing of the appeal and motion, although it is assumed that they were dismissed and denied, inasmuch as the Court referred the matter to the OAE.

In support of his appeals and motions, respondent included certifications containing the following false statements, all without any factual basis:

1. The judge had shown an inordinate interest in the well-being of the DAG, had private conversations with her, was seen driving in her car, was with her in his car and in general treated her as something more than a professional.[4]

2. The judge showed favoritism toward the DAG and DYFS to the detriment of J.D. and her son and had taken it upon himself to present certain parts of the State's case.

---

[4] The facts adduced at the ethics hearing showed that, on one occasion, when the DAG arrived at the courthouse, she inadvertently parked in an illegal parking space. When she left the courthouse at the end of the day, she discovered that her vehicle had been towed. Judge Hanifan offered to take her to the parking lot to which her vehicle had been towed, approximately one mile from the courthouse.

3. The judge had complained for weeks of an inability to see, breathe, and comprehend what was going on and had failed to read and understand filed materials.[5]

4. The judge had broken down on the bench and had ended respondent's participation in the case simply because he had become red-faced, could not breathe properly and had an anxiety attack on the bench.

5. The judge had insulted J.D. on numerous occasions and permitted the DAG and DYFS to insult her over vigorous objections and made light of her poverty by permitting the Sussex County Counsel, a close friend of the judge, to belittle the defense efforts made for her.

6. The judge engaged in religious bigotry, made religion an issue in the case, referred disparagingly to the "Jewishness" of respondent's co-counsel, Bonnie Einhorn, and permitted the DAG to insult Einhorn's religion.[6]

7. The judge insulted respondent and Einhorn, took joy at being discourteous to respondent in the courtroom and belittled the defense's efforts to prove that J.D.'s son was not doing as well as alleged in foster care.

8. The DAG acknowledged that she kept materials relevant to the case hidden in the trunk of her car until she was ordered to bring them to court.

In addition to the above false statements, respondent made misrepresentations to his client about the appeals and the federal litigation he was to file on her behalf. He never told her that the Appellate Division had barred him from appearing in any court on

---

[5] The record reflects that, during the trial, Judge Hanifan referred to the poor ventilation in the courtroom. He also explained that he suffers from a condition that causes his eyes to water.

[6] This allegation apparently is based on the fact that Einhorn herself had made a reference to the biblical story in which King Solomon was called on to decide a child custody matter.

the matter. Respondent did not notify J.D. that an appeal of the decision to terminate her parental rights could have been heard if she had retained other counsel. On October 14, 1992, respondent wrote the following to J.D.:

Your case on appeal is now before the New Jersey Supreme Court without you having cooperated with this office in any way. Since you seem less than seriously interested in this matter, I will simply notify you of the results when and if the Court makes a decision.

Moreover, on December 14, 1992, respondent advised J.D. that the Supreme Court decided not to hear her appeal and returned the matter to the Appellate Division. That was untrue. The matter had not been returned to the Appellate Division, but dismissed outright on DYFS's motion. No appeal on the merits was ever heard.

Respondent also misrepresented to his client the status of the promised federal civil rights litigation. Although respondent initially became involved in J.D.'s termination of parental rights case to observe the state court proceedings in preparation for filing a federal civil rights action on her behalf, no such lawsuit was ever filed. J.D. testified at the ethics proceeding that not only did respondent state that he had filed the lawsuit, but he requested funds from her for the expenses of such litigation.

In at least four separate pieces of correspondence, respondent either implied or stated directly that the federal lawsuit was proceeding. By letter of August 4, 1992, respondent told J.D., "I would anticipate actually beginning the federal case within the next week or so." Respondent represented to J.D., in a letter dated August 19, 1992, that "I will continue on with my work for you both in the state courts in the Appellate Div. and in the federal district court in New Jersey. I will be in touch with you shortly since the situation in each of these cases is becoming critical." Again, by letter of September 28, 1992, respondent referred to J.D.'s "cases," implying that both the federal and state litigation was ongoing. On October 14, 1992, respondent informed J.D. in a letter that "[t]he federal lawsuit is in process." Respondent did not substantiate any of these representations, as, for

example, giving J.D. a copy of the complaint. The Clerk of the United States District Court for the District of New Jersey later confirmed, on October 17, 1995, that respondent did not file a federal complaint on behalf of J.D.

The Special Master noted in his report that, during a conference prior to the ethics hearing, respondent admitted that he never filed the federal lawsuit, contending that he never received an affidavit of indigency from J.D. which was needed to avoid payment of the filing fee. However, there is no mention of an affidavit of indigency in any of the correspondence from respondent to J.D. To the contrary, by letter dated October 6, 1992, respondent told his client that "[t]he bills in your cases have begun to run up as I had suspected they would. For example, the filing fee alone for the federal district court complaint is $120."

After the conclusion of the *A.R.S.* trial, respondent began repeatedly pressing J.D. to send him funds. During an approximate seven-month period, from May 27, 1992, through January 2, 1993, respondent sent twenty letters to his client, many of which requested payment of fees or expenses. Respondent took this action despite his awareness that J.D's financial circumstances were such that she qualified for free legal services provided by Somerset–Sussex Legal Services. As noted above, respondent also accused Judge Hanifan of ridiculing J.D. due to her poverty. Notwithstanding respondent's knowledge of his client's financial situation, by letter dated March 29, 1992, he wrote as follows:

As you know, we have advisedy [sic] you for at least six months or so that certain things needed to be done on your behalf in the case, such as the subpoena of certain individuals. That sort of things [sic] requires the payment of money to process servers on a timely basis. You have admatly [sic] refused to finance this case for your own reasons. . . .

As a client of Somerset–Sussex Legal Services, J.D. was not financially responsible for expenses of litigation, such as process-servers.

Respondent sent J.D. a retainer agreement dated July 2, 1992, concerning the federal litigation. After making changes to the agreement, J.D. signed and returned it to respondent. By letter

of August 19, 1992, respondent informed J.D. that all revisions were acceptable to him, except the following that she had inserted into the agreement: "This agreement would only be effective when you gain back custody of [your son]." Respondent indicated in the letter that, with the understanding that the above provision was removed, he would continue working on both the state and federal court matters.

J.D. finally paid respondent $500 with funds borrowed from relatives. When J.D. requested an accounting of the $500, respondent sent her a letter dated July 30, 1992, requesting payment for the following services:

| | |
|---|---|
| 46 trial days at 8 hours per day [7] | 368 hours |
| Travel time | 92 hours |
| Legal research | 57 hours |
| Total | 517 hours |

Respondent applied an hourly rate of $250 toward a fee of $129,250 plus expenses of $125.

After sending J.D. several letters requesting payment, by correspondence dated January 2, 1993, respondent threatened to sue her for his services in the termination of parental rights trial:

Also, you may rest assured that, if our representation of you is terminated because of your continuing lack of cooperation with us, I will initiate legal action against you, personally, for payment of all outstanding amounts, including attorneys fees and advanced costs, which amount to more thna [sic] $120,000 by now in the several cases in which we have provided legal services to you.

Respondent neither filed a federal civil rights action on behalf of J.D., nor sued her for his fees.

\* \* \* \* \* \* \* \*

From the beginning of the OAE's investigation of the within grievance, respondent failed to cooperate. In reply to the OAE's initial letter requesting a written response to the grievance, he

---

[7] Respondent apparently billed eight hours per day for every trial day, despite his complaint that Judge Hanifan often would devote only one-half of a day, or less, to the *A.R.S.* trial.

reported that his original files were in storage out of state and requested an additional two weeks, until May 1, 1995, to submit his response. By letter dated April 25, 1995, to the OAE, respondent confirmed that he would be able "to forward the required items to you by the end of the first week in May." After the OAE sent another request, he explained in a letter dated May 22, 1995, that "we have relocated our offices recently and, in the midst of that process, I fell ill for about three weeks.... As I suggested to you before, the files in the underlying matter are not only voluminous but also in storage out of state." Respondent represented that he would comply by June 5, 1995. However, the next day, May 23, 1995, in a lengthy letter responding to the grievance respondent added that "the materials you forwarded to my office and what I have available at this time constitute only a very small percentage of the file materials...." Respondent also mentioned that he had not received copies of the trial transcripts referred to in the grievance. As a result, the OAE sent the transcripts to him on May 26, 1995. On June 4, 1995, respondent stated that he would need more time to reply because "[t]here is simply no way that I could possibly review in detail the transcript materials and review the very voluminous files we have ... which are stored out of state...."

In answer to the OAE's suggestion that respondent attend a meeting on July 13, 1995, at the OAE's office, he sent a letter on June 16, 1995, asserting, "I cannot be available on the date you proposed since I am leaving the state in a few days and will not be returning until the second week in July." He suggested that the meeting occur on July 27 or August 3. The OAE subsequently discovered that respondent did not leave the state, as he had represented. On June 29, 1995, he had attended a deposition in another matter in Woodbridge, New Jersey.[8] The meeting with the OAE finally took place on August 3, 1995.

---

[8] The deposition was in the *Pathmark* matter, which is the subject of District Docket No. XIV–95–406E, based on a grievance filed by Hal Crane, Esq.

When the OAE contacted respondent to schedule a follow-up meeting to continue the interview and requested that he bring his file, respondent replied, "As far as any file materials to be provided to your agency are concerned from my office, I am in the process of considering your requests and will inform you of my position at the forthcoming meeting." Respondent then suggested that the materials in his files were protected by the attorney-client privilege. When the OAE requested that he produce his files by September 11, 1995, respondent replied on August 30, 1995, that he would be on vacation until September 13, 1995. Again, the OAE later learned that respondent had misrepresented his availability and was not on vacation, as he had stated.[9] Despite the representation that he would be on vacation until September 13, 1995, respondent asserted in a letter dated September 11, 1995, to the OAE that he would bring his files to the OAE's office on September 20, 1995. By letter of September 19, 1995, he sent to the OAE eight documents purporting to be "the original file materials in my current possession." When the OAE asked how eight documents could be considered "voluminous," as respondent had previously represented, he replied as follows:

> Insofar as your further demands for my "complete files" in the underlying matter are concerned, regrettably, you have all that is available because I have nothing else to forward for your review along these lines. I was incorrect if I gave you the impression of some files containing many thousands of pages, and if taht [sic] is how you took my use of the word "voluminous" in my prior letter, I sincerely apologize.

Despite the repeated demands made by the OAE, respondent never produced his original file in the *A.R.S.* matter.

*     *     *     *     *     *     *     *

During the exchange of correspondence between respondent and the OAE in this matter, the OAE noted that his letterhead contained the following designation: "The Law Office and Legal

---

[9] At the ethics hearing, the OAE introduced seven letters written by respondent between September 1, 1995, and September 12, 1995, relative to the *Crane* grievance. In two of those letters, respondent confirmed his receipt of letters from Crane dated August 31, 1995, and September 8, 1995, respectively.

Clinic of L.T. Vincenti, Esq." Accordingly, the OAE requested that respondent provide a copy of the disclosure required by *RPC* 7.5(e), which states:

> A law firm name may include additional identifying language such as " & Associates" only when such language is accurate and descriptive of the firm. Any firm name including additional identifying language such as "Legal Services" or other similar phrases shall inform all prospective clients in the retainer agreement or other writing that the law firm is not affiliated or associated with a public, quasi-public or charitable organization. However, no firm shall use the phrase "legal aid" in its name or in any additional identifying language.

Respondent replied to the OAE's request as follows:

> In that regard, your request as to any 7.5 material is rejected since our "letter-head" terminology does not fall within the clear mandate of that rule's require-ments. I would suggest that you re-read the pertinent rule section and then re-read my letterhead. None of the covered terms, words or phrases are contained within my letterhead. Therefore, there is no need for my office to conform to the provisions of 7.5 that you cite.

## II. *The Pathmark Matter—Docket No. XIV–95–406E*

Respondent represented Louis Lombardo in two matters against Lombardo's former employer, Pathmark Stores ("Path-mark"). One was a claim for unemployment benefits with the Department of Labor, Division of Unemployment Insurance, and the other was a wrongful termination lawsuit. Hal Crane, the grievant herein, represented Pathmark in both matters. Accord-ing to Joseph F. Wobbekind, a hearing examiner with the Division of Unemployment Insurance, unemployment claim hearings are conducted before a hearing examiner and typically last about twenty-five minutes. Lombardo's hearing lasted one and one-half hours on the first day and the better part of a day during a second session. At the unemployment claim hearing, respondent's behav-ior was similar to that displayed during the *A.R.S.* trial. When James DiPadian, a Pathmark employee, was testifying, he handed respondent a document. Respondent literally threw it back at DiPadian. When DiPadian tried to state what had happened for the record, respondent denied the incident and called DiPadian a liar. He also called Crane a liar several times. At the ethics hearing, Wobbekind testified that, in his twenty years as a hearing

examiner, during which approximately 1,000 attorneys had appeared before him, he had never seen an attorney as unruly as respondent.

On June 29, 1995, Crane took Lombardo's deposition in a conference room at Crane's office. Respondent appeared on behalf of Lombardo. Respondent obstructed the deposition many times, constantly instructed his client not to answer Crane's questions and repeatedly threatened to have a judge resolve minor issues that arose during the deposition. Respondent called Crane "a shill for a five billion dollar corporation—you got that right, shill for a five billion dollar corporation." When the deposition had ended, respondent and Lombardo left the conference room. Respondent suddenly reappeared, walked over to Crane, and struck him in the torso, while calling out that it was Crane who had hit him. Both Crane and Jennifer Realmuto, the court reporter and the only other witness to the incident, testified at the ethics hearing that it was respondent who struck Crane. Although Crane ordered respondent to leave, he had to be escorted from the building by a security guard. Realmuto also testified that, during the deposition, respondent called Crane insulting names, made highly personalized objections and acted in a way she had never before seen an attorney act.

Shortly after the deposition, respondent and Crane appeared in court for a motion. Crane was seated across the aisle from Andrew Kessler, an attorney neither respondent nor Crane had previously met. Kessler testified at the ethics hearing as follows:

> Mr. Vincenti came in and Mr. Crane asked him a question. His question was something to the effect of did you get a copy of the deposition transcript. And Mr. Vincenti replied, Are you talking to me? Are you talking to me? I thought you needed a bodyguard to talk to me. And then he looked over to me and said, you know, is he your bodyguard?

Kessler added that at first he thought respondent was loud and aggressive, then he had the impression that respondent was being sarcastic.

Crane explained at the ethics hearing that he had a growth on his chest that was being monitored by his physician during the

time that respondent struck him. Although the growth was not cancerous, respondent had torn away a part of the scab when he struck Crane, causing Crane additional anxiety. Crane testified about the effect respondent's misconduct had on him, as follows:

[T]he whole incident was just so shocking to me that I couldn't do any work for the balance of that day. I just was astounded at what had happened.... And quite frankly, I thought at that point, if this is what the practice of law has come to, I don't want to be any part of it. If lawyers can't treat each other with minimum respect and start assaulting each other, then there's no reason for people to be attorneys, and I gave some serious thought as to whether I wanted to continue practicing law. I certainly didn't want to have much of anything to do with Mr. Vincenti ever again.... The 4th of July, I spent the entire time in the bedroom that I use as an office in my home and just didn't come out. My family is upset I didn't want to talk to anybody. I was in a very depressed mood from this.

Crane related that to avoid further encounters with respondent he subsequently engaged the services of another attorney to represent Pathmark in the wrongful termination litigation.

\*        \*        \*        \*        \*        \*        \*        \*

At the conclusion of the ethics hearing, the Special Master found that respondent had violated all of the *Rules of Professional Conduct* cited in the complaint. In addition, the Special Master determined that, by misrepresenting to the OAE on two separate occasions that he would be unavailable for a meeting during the investigation of the grievances, respondent violated *RPC* 8.1(a) (making a false statement of a material fact in connection with a disciplinary matter).

The Special Master also found that respondent violated *RPC* 3.2 and *RPC* 8.4(d) by his courtroom behavior in both the *A.R.S.* and *Lombardo* matters. He concluded that respondent was "discourteous, disrespectful, and insulting toward the tribunals, opposing counsel and witnesses." The Special Master also found that respondent's verbal attacks, as well as his physical attack on Crane, went well beyond the bounds of trial advocacy and constituted intimidation of opposing counsel and witnesses.

Moreover, the Special Master determined that respondent's behavior during the *A.R.S.* trial violated *RPC* 3.5(c) and *RPC* 4.4. The Special Master noted respondent's allusion to irrelevant mat-

ters when he asked Haymaker whether he was an aficionado of pornography or a militarist and when he made an issue about the color of the social worker's notepaper and paper clips. According to the Special Master, respondent offered his personal opinions about the case by suggesting that DYFS had done everything it could to destroy the relationship between the child and his natural mother. The Special Master found that respondent gave his personal opinions about witnesses' testimony and the manner in which the DAG presented her case. The Special Master concluded that the above misconduct was contrary to *RPC* 3.4(e). The Special Master also found that respondent violated *RPC* 3.5(c), in that his conduct, questions and motions had no purpose other than to prolong the trial and harass the court, witnesses and opposing counsel. According to the Special Master, respondent's harassment of witnesses, repetitive questioning, and "harangues" against the witnesses were "wantonly cruel and uncalled for," while the letter he sent to the Association of Trial Lawyers of America declaring that the social worker and Hagovsky maintained Nazi views was malicious and vindictive. The special master found that respondent violated *RPC* 4.4 by such conduct.

Also, respondent's filing of motions and appeals contrary to two court orders removing him from the case violated *RPC* 3.1, *RPC* 3.4(c) and *RPC* 8.4(d), according to the Special Master's report. The Special Master commented that respondent could not credibly assert that he was not obligated to abide by the court orders entered by Judge Hanifan and the Appellate Division, which prohibited him from participating in the *A.R.S.* matter. Further, the Special Master found [that] respondent committed an additional violation of *RPC* 3.1 by requesting to have transcripts prepared at public expense after the Appellate Division had denied such relief. The Special Master determined that respondent's misrepresentations in his certifications in support of the motions submitted to Judge Stanton, the Appellate Division and the Supreme Court violated *RPC* 3.3(a)(1) and *RPC* 8.4(c).

The Special Master also ruled that respondent's failure to inform his client that the Appellate Division would not entertain an appeal filed by respondent on her behalf violated *RPC* 1.4(b); that his misrepresentations to her regarding the status of the appeal and the federal court action violated *RPC* 8.4(c); and that his demand and acceptance of funds from J.D., without entitlement to such funds because of J.D.'s indigency, constituted overreaching in violation of *RPC* 1.5(a).

With regard to respondent's conduct toward the OAE, the Special Master found that he violated *RPC* 8.1(a) and (b), *RPC* 8.4(c) and *R.* 1:20–3(g)(3). The Special Master remarked that respondent used delaying and deceptive tactics to impede the investigation, misrepresented his availability for interviews on two occasions by contending that he would be out of state when he was not, and refused to produce his file in the *A.R.S.* matter. The Special Master found that respondent's excuse that he could not produce the file based on attorney-client privilege was not valid, particularly in light of the comment to *Rule* 1:20–3(g)(3), which makes clear that confidentiality or privilege may not be asserted in these matters.

Finally, the Special Master ruled that respondent's use of the phrase "Legal Clinic" on his letterhead violated *RPC* 7.5(e). Although that particular phrase does not appear in the rule, the Special Master found that its use was misleading and that "a client would be even more likely to believe that a firm using the designation 'Legal Clinic' is associated with some type of public or charitable organization than a firm with the name 'legal services.' "

In summarizing respondent's misconduct, the Special Master made the following remarks:

> Respondent's brief seems blind to the fact that there is a line between aggressive advocacy and the behavior of an arrogant bully. The feral character of his groundless personal attacks upon the witnesses and opposing counsel in *A.R.S.* and the *Pathmark* case and upon the judge in *A.R.S.* evidence only his rancorous disposition and his utter contempt for the basic sensitivities of other people. His conduct went far beyond the limits of aggressive lawyering.

What clearly emerges from respondent's brief is his inability to conceive that he has done anything morally reproachable. We have no doubt that respondent is contumaciously intent on marching to the beat of his own drummer with complete indifference to established rules of professional behavior and with absolute disregard for the authority of the OAE.

In a supplementary report issued on August 26, 1996, the Special Master recommended that respondent be disbarred expressing the following view of respondent:

From his prior history, from the record of these proceedings and from respondent's performance in defense of the OAE's complaints herein it is clear that respondent is incorrigible. While the seriousness of his misconduct does not reach the level of that shown by his previous ethical violations, respondent still does not appreciate that there are boundaries for acceptable behavior that are entitled to a healthy respect. In our view, his capacity for distortion, outright misrepresentation and assaultive conduct is boundless. It would constitute a gross betrayal of the clients who retain his representation and the members of the Bench and Bar who must deal with him to allow respondent to go on testing the system in search for that minimal ethical standard at which he will be permitted to function.

*       *       *       *       *       *       *       *

Following a de novo review of the record, the Board [was] satisfied that the Special Master's conclusion that respondent was guilty of unethical conduct is fully supported by clear and convincing evidence.

Respondent's courtroom behavior in both matters, particularly at the *A.R.S.* trial, was abominable. There, respondent engaged in a prolonged course of misconduct by mistreating virtually every person associated with the proceedings. He was disrespectful and discourteous to Judge Hanifan; antagonistic and hostile to the DAG; intimidating and overbearing to DYFS's witnesses, particularly expert witnesses; and, in general, combative and sarcastic. All in all, respondent failed to observe common courtesy, let alone proper courtroom decorum. Respondent repeatedly used vile tactics in an attempt to verbally and physically bully all involved in the litigation: the judge, opposing counsel and witnesses. Respondent had no basis for attacking these individuals, although he seemed to be operating under the premise that there was some kind of conspiracy in which the judge, the DAG, DYFS staff and DYFS's witnesses were all colluding to deprive his client of

custody of her son. Respondent asked repetitive questions, pursued irrelevant lines of inquiry and launched into lengthy diatribes when making objections and motions. And when Judge Hanifan ruled against him on motions or objections, he accused the court of bias and prejudice. Respondent's overall conduct was prejudicial to the administration of justice, in violation of *RPC* 8.4(d).

Respondent also violated *RPC* 3.4(e), which prohibits an attorney from alluding to irrelevant matters, asserting personal knowledge of facts in issue or stating a personal opinion as to the justness of a cause, the credibility of a witness or the culpability of a civil litigant. As mentioned above, respondent alluded to such irrelevant matters as Haymaker's views on pornography and the military, as well as the social worker's use of purple notepaper. Respondent offered personal knowledge of facts by insisting, for example, that the social worker's office was located in her home or that the DAG owned a time-share property in Maine.[10] Respondent expressed his personal opinion about the case by contending that DYFS had done everything it could to destroy the bond between J.D. and A.R.S. He also commented on the testimony of witnesses, and even called Haymaker a liar. Respondent's courtroom antics also violated *RPC* 3.5(c), which prohibits conduct intended to disrupt a tribunal, and *RPC* 4.4, which prohibits using means that have no purpose other than to embarrass, delay or burden a third person.

Respondent's repeated appeals and motions filed after he was removed from the case by two court orders, one issued by Judge Hanifan, the other by the Appellate Division, violated *RPC* 3.4(c), which prohibits knowingly disobeying an obligation under the rules of a tribunal, *RPC* 3.1, which prohibits bringing a proceeding or asserting an issue unless the attorney has a basis for doing so that is not frivolous, and *RPC* 8.4(d).

---

[10] He was wrong on both scores. The social worker testified that her office has never been located in her home and the DAG testified that she has never owned a time-share property in Maine.

By asserting falsehoods and misrepresentations in his certifications filed with Judge Stanton, the Appellate Division and the Supreme Court, respondent also violated *RPC* 3.3(a)(1), which prohibits making a false statement of a material fact or law to a tribunal, and *RPC* 8.4(c), which proscribes conduct involving dishonesty, fraud, deceit, or misrepresentation. Respondent's certifications were rife with misstatements, half-truths and outright lies, despite the fact that he knew the courts would be considering such assertions in ruling on his requests for relief.

The Special Master also correctly determined that respondent's conduct toward his client violated the *Rules of Professional Conduct.* Respondent's failure to explain to J.D. that the Appellate Division would exercise jurisdiction over the appeal only if respondent did not represent her violated *RPC* 1.4(b). That rule requires an attorney to explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation. Moreover, respondent violated *RPC* 8.4(c) by repeatedly misrepresenting to J.D. the status of both the appeal and the federal litigation. He misled his client to believe that the federal lawsuit was in process and that he had advanced costs in her behalf when he had never filed the complaint. Respondent also violated *RPC* 1.5(c) by seeking, if not extorting, fees from his client to which he was not entitled.

In addition, from the start, respondent failed to cooperate with the OAE investigation. He repeatedly requested more time to file a response to the grievances and to produce his *A.R.S.* file. Respondent twice misrepresented to the OAE that he would not be available to meet, when he was available on both occasions. He gave numerous excuses for not producing the *A.R.S.* file, but gave assurances that he would do so. Yet, he never produced the complete file. Respondent continuously did everything to impede the investigation and delay the proceedings. Such conduct violated *RPC* 8.1(a), *RPC* 8.1(b), *RPC* 8.4(c) and *Rule* 1:20–3(g)(3).

Although the Special Master did not address the fact that respondent was not specifically charged with a violation of *RPC*

8.1(a) (making a false statement of a material fact in connection with a disciplinary matter), the facts in the complaint gave respondent sufficient notice of the alleged improper conduct and of the potential violation of that rule. Furthermore, the record developed below contains clear and convincing evidence that respondent twice misrepresented his availability to the OAE. He told the OAE that he would be out of state and unable to attend a meeting on July 13, 1995. This representation turned out to be false. In addition, respondent contended that he would be on vacation and unable to produce his *A.R.S.* file by September 11, 1995, as requested by the OAE. Again, the record demonstrates that respondent was not on vacation. In light of the foregoing, and of the fact that respondent did not object to the admission of such evidence, the complaint is deemed amended to conform to the proofs. *R.* 4:9–2; *In re Logan,* 70 *N.J.* 222, 232, 358 *A.*2d 787 (1976).

Finally, respondent's use of the designation "Legal Clinic" violated *RPC* 7.5(e). Respondent's position that the rule does not apply is without merit. The rule prohibits the use of "language such as 'Legal Services' or other similar phrases" unless the attorney informs prospective clients in writing that the law firm is not affiliated or associated with a public, quasi-public or charitable organization. The Special Master correctly determined that the phrase "Legal Clinic" is misleading and that respondent violated *RPC* 7.5(e) by failing to disseminate the required notice in connection with that term.

As to the alleged violation of *RPC* 3.2, the Board was unable to find clear and convincing evidence of misconduct in this regard. Accordingly, the Board dismissed that charge in connection with both the *A.R.S.* and the *Pathmark* matters.

In assessing the appropriate quantum of discipline for respondent's numerous and troubling ethics violations, the Board considered that this matter represents respondent's fifth serious encounter with the attorney disciplinary system. Significantly, in this case, respondent has violated many of the same *Rules of Profes-*

*sional Conduct* violated in the prior disciplinary cases. Such recidivism is borne out of respondent's refusal to acknowledge his mistakes and to conform his conduct to the ethics standards applicable to all attorneys. Respondent shows no insight into his behavior or any recognition of the effect his misconduct has on others. As the Board noted in one of respondent's ethics cases:

> The respondent engaged in a calculated pattern of irresponsible, abusive and obnoxious behavior both in and outside of the courtroom during the DYFS ... trial. The Board is convinced that respondent, by both physical contact and verbal and written abusive language ... intended to intimidate all parties involved in the proceedings, including witnesses, other counsel and the Judge.... [R]espondent fails to comprehend either the judicial role or the role of an advocate in a court proceeding.
>
> [*In re Vincenti*, 92 *N.J.* 591, 599–600, 458 *A.*2d 1268 (1983) ("*Vincenti I* ").]

This summary, drafted fourteen years ago in respondent's first brush with the discipline system, continues to be applicable in respondent's current ethics encounter. Indeed, respondent's misconduct in that prior case is strikingly similar to the ethics violations in the within matter. The underlying litigation in *Vincenti I* involved a proceeding brought by DYFS against respondent's client, alleging abuse and neglect of the client's children. Respondent accused the judge of collusion with DYFS, cronyism, prejudging the case and preventing defense counsel from effectively participating in the proceedings. Moreover, in appeals to the Appellate Division and the Supreme Court, respondent accused the judge of bias, prejudice, and religious bigotry during the trial. He also wrote to the judge about "the obvious breakdown you suffered in chambers yesterday." *Id.* at 596, 458 *A.*2d 1268. Unfortunately, fourteen years after *Vincenti I*, respondent still refuses to abide by acceptable standards of courtroom decorum. The words of the Supreme Court in *Vincenti I* are prophetic:

> The shame of it is that respondent does not yet appear fully to appreciate the magnitude of his offense.... conceding only that he may have been "stupid" and that "loss of temper" had played a role in his predicament. As we have demonstrated, the record evinces far more—and much worse—than mere obtuseness and truculence.
>
> [*Id.* at 602, 458 *A.*2d 1268.]

In a later case, *In re Vincenti,* 114 *N.J.* 275, 554 *A.*2d 470 (1989) (*"Vincenti II "*), respondent continued to flagrantly disregard the standards and norms to which all attorneys are held. He indulged in vulgar name-calling, used loud, abusive and profane language against opposing counsel and witnesses, engaged in a course of harassment and intimidation, challenged an investigator to a fight, and was abusive to the trial judge's law clerk.

Just this past February, [we] suspended respondent for one year for, in part, deliberately disrupting the orderly process of disciplinary hearings by attempting to intimidate witnesses, using loud tone and generally displaying rude and offensive deportment in the course of the proceedings. *In re Vincenti,* 147 *N.J.* 460, 688 *A.*2d 582 (1997) (*"Vincenti III "*).

Our state's attorney disciplinary system is known as one of the strongest in the country. Yet, the only type of misconduct for which disbarment is mandatory in New Jersey is the knowing misappropriation of funds. *In re Wilson,* 81 *N.J.* 451, 409 *A.*2d 1153 (1979). In other cases, where disbarment is discretionary, this ultimate sanction is imposed when the Court is convinced that the attorney's character is unsalvageable, that is, when the Court determines that no amount of redemption, counseling or education will overcome the appalling misconduct that has been committed. For example, an attorney convicted of a serious crime may be deemed incorrigible and, accordingly, will be disbarred. The common thread that runs through cases resulting in disbarment is that the conduct is so offensive and obnoxious both to common decency and to principles of justice that there can be no other result. In such cases, the Court expressed its views on disbarment as follows:

> Disbarment is reserved for the case in which the misconduct of an attorney is so immoral, venal, corrupt or criminal as to destroy totally any vestige of confidence that the individual could ever again practice in conformity with the standards of the profession. Disbarment is a guarantee to the public that the attorney will not return to the profession.
>
> [*In re Templeton,* 99 *N.J.* 365, 376, 492 *A.*2d 1001 (1985).]

The Court has applied the principles noted in *Templeton* in a number of cases in which attorneys have shown a continuing disregard for clients, the judicial system and the disciplinary process. In *In re Spagnoli*, 115 *N.J.* 504, 559 *A.*2d 1352 (1989), the attorney accepted retainers from fourteen clients over a three-year period without any intention of performing any services for them. He lied to the clients, assuring them that their cases were proceeding apace. After neglecting their cases to the point that judgments had been entered against his clients, the attorney ignored their efforts to contact him by telephone. To explain his prior failure to appear in court, he lied to a judge. Afterward, the attorney failed to cooperate in the disciplinary process. The Court adopted the findings and recommendation of the Board that the attorney be disbarred:

Respondent's repetitive, unscrupulous acts reveal not only a callous disregard for his responsibilities toward his clients and disdain for the entire legal system, but a deficiency in his character.

\*   \*   \*   \*   \*   \*   \*   \*

The Board concludes that the record shows that respondent's conduct is incapable of mitigation. A lesser sanction than disbarment will not adequately protect the public from this attorney, who has amply demonstrated that his "professional good character and fitness" have been permanently and irretrievably lost. *In re Templeton, supra,* 99 *N.J.* 365, 376, 492 *A.*2d 1001 (1985).

[*Id.* at 517–518, 559 *A.*2d 1352.]

In *In re Moore*, 143 *N.J.* 415, 672 *A.*2d 182 (1996), the attorney accepted retainers in two matters and failed to take any action in behalf of his clients. Although he agreed to refund one of the retainers, and was ordered to do so after a fee arbitration proceeding, he retained the funds and then disappeared. The attorney did not cooperate in the disciplinary investigation.

\*   \*   \*   \*   \*   \*   \*   \*

Similarly, in *In re Cohen*, 120 *N.J.* 304, 576 *A.*2d 855 (1990), the attorney, after accepting representation in a matter, failed to file the complaint until after the statute of limitations had expired. He compounded his misconduct by altering the filing date on the complaint to mislead the court and opposing counsel into believing

that he had timely filed the complaint. The attorney misrepresented the status of the matter to the client, giving assurances that the case was proceeding. The Court disbarred the attorney, observing that "[w]e are unable to conclude that respondent will improve his conduct." *Id.* at 308, 576 *A.*2d 855.

In the instant matter, respondent has not shown any remorse or contrition for any of his wrongdoing. He made only the most insincere of apologies, in which he cast blame on the recipient of his attacks, as, for example, when in response to Judge Hanifan's request that he cease arguing with him, respondent replied, "Well I'm sorry for that. But that's your misperception, not mine."

Perhaps the most appropriate measure of the extent of respondent's misconduct is the effect it had on those involved in the *A.R.S.* and *Pathmark* matters. The DAG testified that she felt she had been "emotionally raped" by respondent. She received psychological treatment directly as a result of respondent's verbal attacks and abusive behavior in the courtroom.[11]

Moreover, the social worker summarized as follows the devastation she felt at the hands of respondent when she finished testifying at the *A.R.S.* trial:

> The feeling I had in leaving the courtroom with Mr. Vincenti had nothing to do with the content of the case, the issues of the case, it all had to do with a sense of feeling intimidated, the attacks were personalized.... I did not leave the courtroom with any physical marks or physical bruises, but let me tell you that emotional scars hurt just as much.

The social worker further testified that respondent's cross-examination caused her anxiety well after the *A.R.S.* trial ended. She also related that respondent's letter to Cheifetz in which he described her as having "Nazi" views "unnerved" her because it was written six months after the trial concluded and appeared to represent a personal vendetta against her. As a result, when the social worker attended the Association of Trial Lawyers of Amer-

---

[11] In addition, the DAG requested and received a transfer from the section in the Attorney General's office that represents DYFS after she had handled such cases for seventeen years.

ica conference, she experienced anxiety that she might encounter respondent.

Finally, Hal Crane testified that he seriously considered retiring from the practice of law as a result of being physically attacked by respondent. He also suffered from severe depression caused by respondent's physical abuse of him.

In sum, respondent has wreaked havoc on many individuals with whom he came into contact during these matters. As a result of his obnoxious and unprofessional manner, respondent left a trail of injuries and wounds that may never heal. As remarked by the Court in *Vincenti I,* "[t]he record lays bare a shameful display of atrocious deportment calling for substantial discipline." *Vincenti I, supra,* 92 *N.J.* at 592, 458 *A.*2d 1268. In this regard, respondent has shown himself to be as ethically bankrupt as the attorneys in *Templeton, Spagnoli, Moore* and *Cohen,* all of whom were disbarred.

The purpose of discipline is to protect the public. *In re Goldstaub,* 90 *N.J.* 1, 446 *A.*2d 1192 (1982). In this case, it is more than the public that requires protection. It is the judicial system itself. Respondent has abused the system time and time again. His frequent displays of incivility harmed not only his clients, adversaries, court personnel and others, but the entire judicial system. Such abuse cannot be tolerated.

In light of the foregoing, the Board unanimously determined that respondent should be disbarred for his numerous ethics infractions. Two members recused themselves.

The Board further determined to require respondent to reimburse the Disciplinary Oversight Committee for administrative costs.

\*      \*      \*      \*      \*      \*      \*      \*

At some point, a court is forced to conclude that it can no longer expose judges, lawyers, litigants, witnesses, and the public to the inexcusable conduct of a renegade attorney. We have passed that

point. The only appropriate sanction for respondent's misconduct is disbarment.

So ordered.

*For disbarment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.

### ORDER

It is ORDERED that **LESTER T. VINCENTI** of **ELIZA-BETH,** who was admitted to the bar of this State in 1971, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that **LESTER T. VINCENTI** be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by **LESTER T. VINCEN-TI,** pursuant to *Rule* 1:21–6, be restrained from disbursement except upon application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the Superior Court who is directed to deposit the funds in the Superior Court Trust Fund, pending further Order of this Court; and it is further

ORDERED that **LESTER T. VINCENTI** comply with *Rule* 1:20–20 dealing with disbarred attorneys; and it is further

ORDERED that **LESTER T. VINCENTI** reimburse the Disciplinary Oversight Committee for appropriate administrative costs.