970 A.2d 1002

JAMES LOBIONDO, JR. AND DENISE LOBIONDO, INDIVIDUALLY AND T/A D. LOBI ENTERPRISES, INC., PLAINTIFFS–APPELLANTS, v. GRACE SCHWARTZ, JANICE DEMARCO, KAREN SCHWARTZ AND MARILYN KALLAREOU, DEFENDANTS AND THIRD–PARTY PLAINTIFFS–RESPONDENTS/APPELLANTS, v. GIORDANO, HALLERAN & CIESLA, P.C., MICHELE A. QUERQUES, ESQ. AND STEVEN BERLIN, ESQ., THIRD–PARTY DEFENDANTS–RESPONDENTS.

Argued September 23, 2008—Decided May 14, 2009.

*Thomas J. Hirsch* argued the cause for appellants James Lo-Biondo, Jr. and Denise LoBiondo.

*Ira B. Karasick* and *Joan E. Pransky* argued the cause for defendants and third-party plaintiffs-respondents/appellants Grace Schwartz, Janice DeMarco, Karen Schwartz and Marilyn Kallareou.

*Mark M. Tallmadge* argued the cause for third-party defendants-respondents (*Bressler, Amery & Ross,* attorneys; *David F. Bauman,* on the letter brief).

Justice HOENS delivered the opinion of the Court.

One of our most cherished, carefully guarded rights is freedom of speech. When exercised in the context of a protest directed to a governmental authority, it gains greater weight because the speech implicates other important principles, including our right to petition and seek redress for our grievances. Efforts, particularly by the more powerful in our society, to limit the free exercise of one's speech are appropriately viewed with suspicion and distaste.

Equally important to our society, however, is the right of our citizens to freely access our courts, that they may there achieve a vindication of rights or a recovery sufficient to remedy damage done to person or reputation. Although tempered by a variety of rules and procedural safeguards, our society would be the poorer were those rights not also carefully safeguarded.

The matter now before us centers on all of those rights being exercised by the parties in such a way as to put them on a collision course; more to the point, it demonstrates the need for a careful balancing of the ways in which the parties may exercise their rights and of the remedies that might pertain when, in that exercise, the rights of different parties are in conflict.

During the tortured path that this matter has taken prior to our grant of certification, the parties have battled before municipal planning authorities, tried a part of their dispute to a verdict, seen that verdict reversed and a new theory of law applied to the matter, expanded their dispute to include new parties pursuant to the new legal theory, engaged in extensive motion practice that resulted in a dismissal of the new claims, and found some, but not all, of those claims revitalized with yet another explanation of the new and expanded legal theory on appeal. In the end, the dispute is both an exceptionally local battle between neighboring landowners and a surprisingly public one between parties who disagree

about the very existence of the rights that each insists is his or hers to assert.

Viewed in its narrowest terms, the matter before the Court calls upon us to consider rights and remedies that will be available, and how they operate as against different potential defendants, in the unique context of litigation referred to as Strategic Lawsuits Against Public Participation (SLAPP) suits. Although the matter might be seen in far broader terms, and although our analysis has wider implications, it is this more modest focus that frames and motivates our decision.

We frame our holding accordingly, in light of the inescapable reality that our decision will have broader impact than merely its application to these parties or to SLAPP suits.

Today we hold that our common law cause of action for malicious use of process, although a disfavored one, is a viable response to a SLAPP suit, a vehicle often referred to as a SLAPP-back suit. Consistent with longstanding precedents, we require that its assertion abide the favorable resolution of the litigation to which it responds.

More specifically, we hold that the required elements of the tort, namely, the filing of a complaint, without probable cause, that was actuated by malice, that terminated in favor of the party now seeking relief, and that caused the party now seeking relief to suffer a special grievance, must all be proven, but we refine them to meet the circumstances of a SLAPP suit. In particular, we recognize that one who can demonstrate that as a result of the SLAPP suit his or her right to free speech or to petition was actually infringed will thereby satisfy the special grievance element of the cause of action.

We also note that traditionally one who can prove that the original complaint was filed based on the advice of counsel after a full and fair presentation of the facts is entitled to the benefit of a complete defense, because he or she can demonstrate it was not filed without probable cause. We find no basis on which to vary

from that approach, and we recognize the viability of that defense in the SLAPP-back context.

However, we hold that if and when the advice-of-counsel defense is asserted, the party seeking relief may then pursue a cause of action against the attorney claimed to have been the source of that advice as well. We do so mindful that the attorney's primary duty is to be a zealous advocate for his or her own client and recognizing the potential for harm that may arise from permitting a suit by a nonclient arising from the attorney's role in representing a client. We therefore require a separate evaluation of the proof that the original claim was actuated by malice when the target is the attorney. In that event, the proof must focus on the motivation of the attorney and must demonstrate that his or her primary motive was an improper one. Only when the required elements of proof are interpreted in this fashion will they be consistent both with the usual elements of the malicious use of process cause of action, and with the role that our disciplinary process and sanction powers ordinarily occupy.

## I.

The decision in this matter, and the analytical framework within which we reach it, can only be understood in the context of the rather lengthy course of the dispute in which these parties have been embroiled. Although some of the facts and allegations were described in an earlier published appellate decision, we include them for completeness and context.

## A.

This appeal has its origins in 1986 when plaintiffs James Lo-Biondo [1] and his wife Denise purchased the Surfrider Beach Club in Sea Bright and began their operation of the business as D. LoBi Enterprises, Inc. Shortly thereafter, they met their across-

---

[1] Because all of the factual assertions relate only to acts by James LoBiondo, our references to "plaintiff" or to "LoBiondo" are to him.

the-street neighbor, defendant Grace Schwartz [2], who came to visit the club and who immediately started an argument with them about whether she and her grandchildren should be exempted from the usual admission price.

A year after purchasing the club, plaintiff, who wanted to expand the business, filed a site plan application. Schwartz, who opposed any expansion, appeared with an attorney at the Planning Board meeting in April 1987 to oppose the application. At that meeting, LoBiondo assured the Planning Board that he intended to operate a restaurant that would be open only to Club members and that it would have no liquor license and no on-premises cooking capabilities. The site plan application was approved in June 1987.

In 1989, a zoning ordinance amendment eliminated restaurants as a permitted use in the zone. Notwithstanding that, in May 1990, LoBiondo applied for a certificate of occupancy for a dining room at the Club. While the application was pending, the Club began a membership campaign, advertising to prospective members that the Club would "be serving a complete menu" and "opening [a] dining room" from 6:00 p.m. to 2:00 a.m. in the summer and for lunch and dinner in the winter. In addition, the membership invitations advertised that "[a] private club liquor license has been approved by the State of New Jersey ABC." In fact, no license had been approved, and the State Division of Alcoholic Beverage Control so advised LoBiondo when it learned of the membership invitation through a "citizen complaint" in July 1990.

Although in fact the Club was not serving food to non-members and was not serving alcohol at all, it then began advertising that it was offering free pizza delivery from an on-premises pizza parlor. After being told by the Building Inspector that "pizza take out" was not a permitted use for the Club, LoBiondo sought relief from

---

2 Our factual references to "Schwartz" refer only to Grace Schwartz.

the Planning Board. That body concluded that a public restaurant at the Club constituted a pre-existing non-conforming use.

Schwartz, who had objected all along, then began her attempts to stop LoBiondo from expanding the Club. Although she had refused to purchase a membership in the Club and therefore was not entitled to be there, according to LoBiondo, she and her daughters, defendants Janice DeMarco, Karen Schwartz, and Marilyn Kallareou, came onto the property to inspect the parking areas, bathroom facilities and living premises without permission. In addition, Schwartz distributed flyers [3] urging others to join her in opposing LoBiondo's efforts to "put a year round public club-restaurant in our residential area," and she wrote letters to the Planning Board's attorney and to the State Departments of Community Affairs (DCA) and Transportation complaining about municipal actions in connection with the property. Her efforts, based upon her daughters' observations, to convince the Planning Board that there was insufficient parking were unsuccessful.

Schwartz then filed a complaint in lieu of prerogative writs, seeking to challenge the Planning Board's pre-existing non-conforming use determination. That complaint succeeded in 1992. In short, the trial court concluded that the Planning Board's decision was "arbitrary and unreasonable" because it had relied on LoBiondo's representations about the historical uses of the property, when they were contradicted by neighbors' testimony and by some of his own testimony as well.

In June 1991, while the prerogative writ matter was pending, LoBiondo met with Norman Hobbie, an attorney at the law firm of third-party defendant Giordano, Halleran & Ciesla, P.C., in Middletown, to learn about what rights he might have against Schwartz and others. According to LoBiondo, Hobbie advised him that he should not pursue litigation against municipal officials,

---

[3] Copies of some of these materials are appended to the Appellate Division's decision. See *LoBiondo v. Schwartz*, 323 *N.J.Super.* 391, 425–34, 733 A.2d 516 (App.Div.1999).

but stated that he had a "very strong case" against Schwartz and her daughters. LoBiondo then retained the Giordano firm to represent him.

After that initial consultation, Michele Querques, then an associate at the Giordano law firm, investigated the facts as reported by LoBiondo. She reviewed two internal DCA memoranda relating to the Club, one of which indicated that there were, at least at one time, "serious code violations with respect to this project," and the other of which noted that "Mr. LoBiondo has not been completely forthcoming in [h]is dealings with the Bureau and the Borough of Sea Bright." After interviewing DCA's Director of Division of Codes and Standards, Querques concluded that there was "some substance" to Schwartz's complaints to DCA. In addition, she met with LoBiondo to discuss his claims. She later described him as "very upset and very emotional" over what he perceived to be "a campaign, [and] a vendetta" by Schwartz and her daughters to ruin his business and reputation.[4]

As part of the law firm's analysis of the matter, Stephanie Fox, a summer associate at the Giordano firm, prepared a memorandum, dated July 9, 1991, in which she discussed various potential causes of action against Schwartz. She expressed reservations about a potential defamation claim by LoBiondo, commenting that the newspaper articles and zoning board minutes that he had supplied did not contain defamatory statements and that Schwartz's letters and flyers might be privileged. Her memo nonetheless suggested that LoBiondo might have a basis for his defamation claim and also commented that there were grounds for claims of tortious interference with a prospective economic advantage and tortious interference with contractual relations.

---

[4] This testimony, which included other recollections revealed by Querques in her deposition about the information provided to her by LoBiondo, was not before the Appellate Division during the first appeal. It was generated during the discovery conducted following the remand and the service of the third party complaint.

In October 1991, Querques, after meeting with LoBiondo, completing her investigation, considering the Fox memorandum, and conducting supplemental legal research of her own, filed a complaint in Superior Court against Schwartz and her three daughters. The complaint demanded damages on behalf of LoBiondo, his wife, and their business, based upon claims sounding in defamation, tortious interference with economic opportunities, intentional infliction of emotional distress, and loss of consortium.

Schwartz and her daughters counterclaimed for malicious prosecution and malicious abuse of process, asserting that LoBiondo's complaint was a SLAPP suit, and for intentional infliction of emotional distress. In March 1996, LoBiondo filed an amended complaint, adding a new count alleging that the counterclaim constituted an abuse of process. After settlement discussions proved to be unfruitful, the attorneys at the Giordano firm informed LoBiondo that they "no longer felt there was a strong likelihood of success in connection with his affirmative claims." Although LoBiondo also expressed reluctance about proceeding, when the parties were unable to settle, the case proceeded to trial in 1996, with attorney Steven Berlin as lead counsel for LoBiondo.

In what subsequently became a significant focal point of the parties' dispute, LoBiondo testified about his reasons for suing Schwartz and her daughters. The parties point to different parts of his trial and deposition testimony concerning his motives to support their positions. Schwartz, for example, points out that when LoBiondo was asked if he had "an agenda in pursuing this suit that you have filed through your attorney against Mrs. Schwartz" and "an agenda to silence her voice against concerns she has expressed about your premises," he conceded that silencing future opposition from Schwartz and her daughters was at least part of his reason for suing her. LoBiondo and his attorneys point out that he denied that his purpose was to prevent her from exercising her rights to speak, responding when asked that such an intention would be "terrible."

All of the claims against Marilyn Kallareou and Karen Schwartz were dismissed prior to a verdict, but the jury returned a verdict for LoBiondo against the other defendants. The verdict was complicated by the variety of parties, claims, and counterclaims. Concluding that Schwartz had defamed the LoBiondos, intentionally interfered with their business, and intentionally caused LoBiondo mental anguish, the jury awarded D. LoBi Enterprises $66,300 in compensatory damages for defamation and $30,000 (reduced by the trial court to $3,000) for intentional interference. Based on the same theories, the jury also awarded LoBiondo $100,000 in punitive damages. At the same time, the jury found for Karen Schwartz and for Marilyn Kallareou, the two daughters who were not liable to LoBiondo, on the counterclaim against D. LoBi Enterprises, awarding small verdicts to each. The jury did not find for Schwartz or DeMarco on the counterclaim.

## B.

Both sides appealed, and the Appellate Division, in a published opinion, see *LoBiondo v. Schwartz* (*LoBiondo I*), 323 *N.J.Super.* 391, 733 *A.*2d 516 (App.Div.), *certif. denied*, 162 *N.J.* 488, 744 *A.*2d 1211 (1999), reversed the verdict in favor of plaintiffs. In summary, the court focused on the defamation evidence that it appended to the opinion, concluding that because the statements made by Schwartz either were statements of opinion or lacked defamatory meaning, they could not support a recovery. *See id.* at 412–13, 733 *A.*2d 516. In addition, the court reasoned that because Schwartz was petitioning about a public issue and because LoBiondo was a limited public figure, the trial court had erred in failing to apply the actual malice standard. *See id.* at 413, 733 *A.*2d 516 (citing *N.Y. Times Co. v. Sullivan*, 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.*2d 686 (1964)). Concluding that all of LoBiondo's other tort claims were based on the same protected conduct, the panel rejected them as well. *Id.* at 417, 733 *A.*2d 516.

Having decided that LoBiondo's complaint should not have been permitted to succeed, the Appellate Division addressed the coun-

terclaim. It is this aspect of the court's analysis that has become central to the way in which the matter has continued to proceed. Following a thorough review of the history of SLAPP suits, the various means and methods by which commentators have suggested they be analyzed and the ways in which courts have responded to such complaints, the panel concluded that "defendants made a *prima facie* showing that the LoBiondo action against them can reasonably be found to have been a SLAPP suit" that was intended to silence lawful speech and participation in democratic processes by Schwartz and her daughters. *Id.* at 421, 733 *A.*2d 516. The court declined, however, to recognize a new cause of action to combat SLAPP suits, noting its "reluctan[ce] to create a tool that might be then used to impair accessibility" of the courts when legitimate injuries are at stake. *Id.* at 422, 733 *A.*2d 516.

Instead, the panel reasoned that SLAPP suits could be addressed in the context of our existing jurisprudence through use of the admittedly disfavored common law tort of malicious use of process. *Ibid.* After analyzing how the traditional elements of that tort would apply in this unique context, however, the panel made two alterations in the proofs that a SLAPP suit victim would need to meet in order to prevail on a malicious use of process claim when pursued as a SLAPP-back suit.

First, the panel concluded a SLAPP defendant's burden of proof on the required element of malice could be satisfied by proof of intent "to retaliate against defendants for exercising their rights of expression and petition or to stop them from further exercise of those rights or both." *Id.* at 423, 733 *A.*2d 516. Second, the court identified a "bundle of freedoms," including freedom of speech and freedom to petition, that were threatened by a SLAPP suit, equating a loss of those rights with a "special grievance" essential to prove the common law cause of action. *Id.* at 423–24, 733 *A.*2d 516.

Based on its analysis, the panel ordered that the verdicts in favor of D. LoBi Enterprises and LoBiondo be vacated and that the LoBiondo complaint be dismissed on remand. *Id.* at 425, 733

*A.*2d 516. In addition, the court set aside the judgments in favor of Karen Schwartz and Marilyn Kallareou in light of the court's analysis of the counterclaim. *Ibid.* The panel presented Schwartz and her daughters with two options on remand, permitting them to seek relief pursuant to the frivolous litigation statute, *N.J.S.A.* 2A:15–59.1, or to proceed with a SLAPP-back suit through their reinstated counterclaim for malicious use of process. *Ibid.*

### C.

Following that decision and remand, Schwartz and her daughters elected not only to pursue the malicious use of process option as refined by the Appellate Division, but to do so by adding a new twist. In May 2000, they filed the amended counterclaim against LoBiondo, in which they demanded damages for malicious use and abuse of process [5] and for intentional infliction of emotional distress. At the same time, however, they added a third-party complaint in which they also sued the Giordano law firm, Querques, and Berlin (the Giordano defendants), charging them as well with malicious use of process, malicious abuse of process, conspiracy to maliciously use and abuse process, and intentional infliction of emotional distress.[6]

Following discovery, LoBiondo and the Giordano defendants separately moved for summary judgment. In an oral opinion, the court granted both motions. That decision was based on the motion court's analysis of the legal theories and the policy implications arising from the fact that malicious use of process is a disfavored cause of action because of its "tendency to chill and to

---

[5] The common law torts of malicious use of process and malicious abuse of process are separate and distinct. Although the court in *LoBiondo I* referred only to the former, both were included in the pleading on remand. The trial court dismissed the claim for malicious abuse of process for reasons not germane to our analysis, and the decision affirming that order has not been challenged.

[6] The intentional infliction of emotional distress claim was dismissed on Giordano's motion in pretrial proceedings and is not before us.

restrict ... access to the courts." The court was particularly troubled that, if permitted to proceed, the claim against the Giordano defendants would impose a duty on an attorney in favor of a nonclient that could be greater than the duty of care that the same attorney owed to his or her own client. The motion court considered case law and statutes from other jurisdictions, commentaries, and the available New Jersey precedents in an effort to discern a rule of law. After doing so, the court reasoned that the Giordano defendants should not be liable "if a reasonable attorney would feel that there was a probable basis or probable cause to bring [a] complaint."

Using this analysis, the court rejected Schwartz's attack on probable cause as being infected by hindsight and found it unpersuasive in light of the fact that LoBiondo's original defamation complaint had repeatedly withstood judicial scrutiny, notwithstanding the Appellate Division's contrary views. Second, the court concluded that there was no evidence of malice on the part of the Giordano defendants, equating that prong with a requirement that Schwartz prove that LoBiondo's factual representations were false and that LoBiondo and the Giordano defendants filed the action knowing it.

The court also dismissed the claim against LoBiondo, essentially recognizing that one who seeks the advice of counsel, who explains the relevant facts to counsel, and who proceeds to file suit based on the attorney's advice, has demonstrated probable cause and therefore enjoys an absolute defense.

## D.

Schwartz and her daughters again appealed, and the Appellate Division, in an unpublished decision, *LoBiondo v. Schwartz* (*LoBiondo II*), No. A–4325–04, 2007 WL 2188600 (App.Div. Aug. 1, 2007), affirmed the dismissal of the claims against the Giordano defendants, but reversed the dismissal as to LoBiondo and remanded for further proceedings.

Focusing first on the claims against LoBiondo, the panel agreed that reliance on advice-of-counsel may provide a complete defense to an action for malicious use of process. However, because that defense requires proof that the client acted in good faith and conveyed all of the facts to counsel both fully and truthfully, the panel concluded that genuine issues of material fact remained for further proceedings on remand. In doing so, the court focused not on LoBiondo's factual assertions, but concluded that the availability of the advice-of-counsel defense also rested upon whether LoBiondo was completely truthful when explaining his motivations to his attorneys. That is, the court required that he prove not only that his factual assertions to counsel were true, but that he also revealed to the lawyers that one of his reasons for proceeding was his desire to silence Schwartz.

The court reached the opposite conclusion when analyzing the adequacy of the proofs on the third-party complaint against the Giordano defendants. In affirming that grant of summary judgment, the court noted that there are mechanisms available to courts to address frivolous litigation, see R. 1:4–8, and unethical behavior, and reasoned that they would be adequate to deter and to respond to an attorney who files a SLAPP suit. At the same time, the panel recognized the need to avoid inhibiting attorneys from taking cases merely because, as here, the parties harbor ill will against each other.

Balancing these concerns, and reasoning that the claim was a novel one, the court looked to the *Restatement (Third) of the Law Governing Lawyers* § 57(2), 57 comment d (2000), for guidance in identifying the circumstances in which a claim for malicious use of process should be permitted to be brought against an adversary's attorney. As articulated by the Appellate Division, the *Restatement* test would require the nonclient to prove that "the attorney (a) knew the client's claim was baseless and either (i) knew the client was litigating for an improper purpose which furthered the lawyer's improper purpose or (ii) litigated for the attorney's own improper purposes." Reviewing the factual record against this

template, the panel found no evidence that the attorneys pursued the litigation with the intent of furthering their own improper purpose and no evidence that the Giordano defendants were aware of, or had adopted, an illegitimate purpose of LoBiondo's. The court therefore affirmed the grant of summary judgment in favor of the Giordano defendants.

We granted the petitions for certification filed both by LoBiondo and by Schwartz and her daughters. 193 *N.J.* 586, 940 *A.*2d 1219 (2008).

## II.

The arguments raised by the parties can be briefly summarized. LoBiondo argues that the standard used by the Appellate Division in *Lobiondo II* to establish the advice-of-counsel defense is impossible to meet. He suggests that we instead embrace a subjective rule that would shield a client who believes that his disclosures to counsel are true and complete. Moreover, LoBiondo asserts that the panel made two errors in deciding that there are factual issues relevant to his advice-of-counsel defense. That is, he first asserts that the panel erred in requiring him to prove that he disclosed his motivations, which he contends are irrelevant to the defense. He further argues that there are no issues to be tried because he provided the Giordano defendants with all of the relevant documents and facts before they filed the complaint. Finally, LoBiondo contends that the panel foreclosed his advice-of-counsel defense by equating the decision in *LoBiondo I* with a finding of no probable cause.

Schwartz[7] urges the Court to reinstate the claims against Giordano. She argues that the Appellate Division erred in its analysis of the third-party complaint against the Giordano defendants. Schwartz argues that the panel misread the *Restatement (Third) of the Law Governing Lawyers,* misunderstood the hold-

---

[7] For purposes of our analysis of the applicable legal principles, our references to Schwartz are intended to embrace Grace Schwartz and her daughters.

ing of *LoBiondo I,* and failed to adhere to what she sees as the
trend in our law to expand an attorney's liability to nonclients. In
particular, Schwartz contends that any sanction against an attor-
ney who files a SLAPP suit short of a malicious use of process
claim will be inadequate and that when the *Restatement* test used
by the appellate court to analyze the claim against Giordano is
coupled with the advice-of-counsel defense it afforded to LoBion-
do, the spectre of a wrong without a remedy is all too real.

The Giordano defendants opposed the Schwartz petition. They
argued that the Appellate Division's interpretation of the stan-
dards governing the claim against them were correct. In particu-
lar, they asserted that the appellate panel's analysis comported
with the applicable *Restatement* principles and with this Court's
longstanding jurisprudence.

## III.

Viewed in its narrowest terms, this dispute is simply about
SLAPP and SLAPP-back litigation. Even in that rather unique
context, however, our grant of certification in this matter requires
us to consider some of the broader implications that will inevitably
flow from the manner in which we address the issues before us.
Seen in this light, we are called upon to consider not only the
rather abstract criteria for the modern-day usage of the common
law cause of action for malicious use of process as a response to a
SLAPP suit, but to evaluate as well two further questions that this
matter well illustrates in the SLAPP-back context. That is, we
must decide whether to permit resort to the traditionally available
advice-of-counsel defense, the effect of which might be to bar
recovery from the party who was the impetus for the prosecution
of the SLAPP suit, because it would demonstrate that there was
probable cause to file the initial litigation. Moreover, regardless
of how we evaluate the availability of the advice-of-counsel de-
fense, we are confronted with the thorny question of whether, and
under what circumstances, the victim of a SLAPP suit can secure

a remedy from the attorney who filed the suit, for that attorney's participation in the initiation or prosecution of that action.

None of these issues is simple; each requires that we examine a wide variety of analytical threads in our effort to announce a rule of law. This effort requires that we explore the essential nature of SLAPP and SLAPP-back suits; that we examine the theoretical underpinnings of the common law cause of action for malicious use of process and its recognized defense of advice of counsel; that we consider the different roles played by the client who seeks to initiate a SLAPP suit and the attorney who advises or assists that client; and that we address the way in which permitting a SLAPP-back suit to include a direct claim against the other party's attorney would advance, impede, or complement our ordinary mechanisms for disciplining and sanctioning members of the bar. Only after a careful analysis of each of those separate underlying principles can we evaluate the arguments of the parties and articulate a principled rule of general application.

## A.

We begin our analysis with an examination of SLAPP suits. The earliest mention of such suits appears in 1988, when the term was used in two separate scholarly articles. *See* Penelope Canan & George W. Pring, *Strategic Lawsuits Against Public Participation*, 35 *Soc. Probs.* 506 (1988); Penelope Canan & George W. Pring, *Studying Strategic Lawsuits Against Public Participation: Mixing Quantitative and Qualitative Approaches*, 22 *Law & Soc'y Rev.* 385 (1988). Those authors posited that there was a nation-wide trend in which large commercial interests utilized litigation to intimidate citizens who otherwise would exercise their constitutionally protected right to speak in protest against those interests. The scholars asserted that the goal of such litigation was not to prevail, but to silence or intimidate the target, or to cause the target sufficient expense so that he or she would cease speaking out. As the Appellate Division in *LoBiondo I* noted, seen in this

stark light, SLAPP suits are an improper use of our courts. *See LoBiondo I, supra,* 323 *N.J.Super.* at 418, 420, 733 *A.2d* 516.

In an effort to deal with and deter SLAPP suits, a large number of state legislatures have responded. The statutes they have enacted, in general, fall into two categories. First, the majority of the statutes find their roots in the United States Supreme Court's *Noerr–Pennington* doctrine, creating immunity that protects actions that fall within the parameters of the redress of one's grievances to the government. *United Mine Workers v. Pennington,* 381 *U.S.* 657, 669–70, 85 *S.Ct.* 1585, 1593, 14 *L.Ed.*2d 626, 636 (1965); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 *U.S.* 127, 135–38, 81 *S.Ct.* 523, 528–30, 5 *L.Ed.*2d 464, 470–71 (1961).

Utilizing that conceptual basis, the first group of SLAPP statutes shares several essential features. They generally include a legislative declaration that a public participant who has exercised his or her free speech right, sometimes in a statutorily defined manner, enjoys immunity. *See, e.g., Cal.Civ.Proc.Code* § 425.16(b)(1) (2009); *Ga.Code Ann.* § 9–11–11.1 (2009); *R.I. Gen. Laws* § 9–33–2(a) (2009); *Tenn.Code Ann.* § 4–21–1001, –1003(a) (2009). They often also declare that the protections will be limited to matters in which the speaker has not spoken in reckless disregard for the truth or falsity of the assertions, *see, e.g.,* 27 *Pa. Cons.Stat.* § 8302(b) (2008) (recognizing exceptions to immunity), or has not "caused actual injury," *Mass. Ann. Laws* ch. 231, § 59H (2008). They define, as precisely as is practical, SLAPP suits or suits that aim to silence or punish that privileged exercise of speech. *See, e.g., Fla. Stat. Ann.* § 718.1224 (2008); *Haw.Rev. Stat. Ann.* § 634F–1 (2008); 735 *Ill. Comp. Stat. Ann.* 110/5 (2009); *Nev.Rev.Stat. Ann.* § 41.635 (2008) (historical note); *N.M. Stat. Ann.* § 38–2–9.2 (2008). Universally, however, these statutes create a special motion for dismissal that is the particular remedy to be used by the target of such a cause of action. *See, e.g., La.Code Civ. Proc. Ann.* art. 971 (2008); *Me.Rev.Stat. Ann.* tit. 14, § 556 (2008); *N.M. Stat. Ann.* § 38–2–9.1 (2008); *Or.Rev.*

*Stat.* § 31.150 (2007). In general, this category of statutes creates that remedy and permits only an award of attorneys' fees and costs, *see, e.g.,* 735 *Ill. Comp. Stat. Ann.* § 110/25 (2009); *Ind.Code Ann.* § 34–7–7–7 (2008), although some specifically refrain from making that the exclusive remedy, *see, e.g., Haw.Rev.Stat. Ann.* § 634F–2(8)(C) (2008); *Mo. Ann. Stat.* § 537.528(2), (5) (2008).

The second category of anti-SLAPP statutes is that in which a state's legislature has chosen to create a separate cause of action designed to afford a means of relief to the target of a SLAPP suit. *See, e.g., Md.Code Ann., Cts. & Jud. Proc.* § 5–807 (2008); *Neb. Rev.Stat. Ann.* § 25–21,243 (2008); *Utah Code Ann.* § 78B–6–1405 (2008). Each of these statutes includes a definition of a SLAPP suit, creates the cause of action, and designates the available remedies. In general, these statutes define a SLAPP suit as being brought in bad faith and with the intention of limiting free speech, and many of them also require proof of an intention to harass or to interfere with the free exercise of those rights. In terms of the available remedies, these statutes include ones in which only attorneys' fees and costs are allowed, those in which compensatory damages may be awarded, and those in which punitive damages are available. Several states have statutes that include a sort of sliding scale through which the plaintiff is limited to recovering costs and fees if the proofs demonstrate only that the suit was filed with no substantial basis in the law, but which permit compensatory damages if there is proof of a purpose to harass or if there is proof of some other malicious intent. *See, e.g., Neb.Rev.Stat. Ann.* § 25–21,243(1) (2009); *Utah Code Ann.* § 78B–6–1405(1) (2008). Others also authorize punitive damages, generally if there is proof that harassment or malicious motivation was the sole purpose for institution of the litigation. *See, e.g., Del.Code Ann.* tit. 10, § 8138 (2008); *Minn.Stat. Ann.* § 554.04 (2008); *N.Y. Civ. Rights Law* § 70–a(1) (2008).

A few jurisdictions have addressed the SLAPP suit phenomenon through their courts. *See TES Franchising, L.L.C. v. Feldman,* 286 *Conn.* 132, 943 *A.*2d 406, 413 n. 10 (2008) (commenting on

absence of SLAPP legislation); *E. Ky. Res. v. Arnett,* 892 *S.W.*2d 617, 618–19 (Ky.App.1995) (considering SLAPP allegations in context of existing tort theories).

These developments have not been entirely uncontroversial because what appears to one party to be a SLAPP suit may, to the other party, be a good faith effort to protect one's own reputation or business either through a suit for defamation or for tortious interference with a contract or a prospective business opportunity. Defining the line that divides one from the other is neither simple nor straightforward. At the time when most of these statutes were being enacted, one commentator cautioned that the potential dangers of "the increasingly promiscuous use of the term [SLAPP suit] by courts and legislators [is] a matter of serious concern." Joseph W. Beatty, Note, *The Legal Literature on SLAPPS: A Look Behind the Smoke Nine Years After Pring and Canan First Yelled "Fire!",* 9 *U. Fla. J.L. & Pub. Pol'y* 85, 87 (1997). As a result, courts must be vigilant so as not to so zealously seek to deter SLAPP suits and those who file them that we unintentionally punish "the plaintiff who seeks redress in good faith for a genuine reputational wrong but whose case unfortunately resembles the paradigm SLAPP." *Ibid.* Another commentator has suggested that a more effective means of deterring SLAPP suits would be to use the tools of discipline against attorneys who file them. *See* Barbara Arco, Comment, *When Rights Collide: Reconciling the First Amendment Rights of Opposing Parties in Civil Litigation,* 52 *U. Miami L.Rev.* 587, 633 (1998) (recommending that SLAPP suits be dealt with by "plac[ing] some burdens on the professional—the attorney—to abide by ethical standards of practice").

Our Legislature has not enacted anti-SLAPP legislation,[8] and in *LoBiondo I* our Appellate Division rejected the argument that a new cause of action directed to such a suit, either as created by

---

[8] Bills have been introduced periodically by sponsors in both the Senate and the Assembly, but none has been enacted.

our Legislature or as authorized through expanded judicially-created sanctions, was needed in order to effectuate an appropriate remedy. Instead, the Appellate Division saw SLAPP suits as simply a modern day example of the ancient, well-established, albeit disfavored, tort of malicious use of process, and elected to analyze it accordingly.

In doing so, the court recognized that seeking to fit the SLAPP suit into that analytical paradigm presents unique challenges and strove to do so in a manner that will fairly balance the rights of the two warring parties. That Schwartz would, on remand, bring LoBiondo's attorney into the litigation likely was not within the panel's contemplation; certainly the facts disclosed in the discovery that followed as to the attorneys and that bear on their evaluation of probable cause could not have been anticipated. In some measure, this intervening discovery has so altered the record that the original panel's analysis of the way in which our tort remedies would operate ill fits the unusual context we now confront. We turn then, to a consideration of the common law tort remedy both historically and as it pertains to the matter at hand.

### B.

Malicious use of process is one of a group of closely related torts that, although ancient in origins, are treated with great caution because of their capacity to chill resort to our courts by persons who believe that they have a criminal complaint or civil claim against another. *See Potts v. Imlay*, 4 *N.J.L.* 382, 386 (Sup.Ct.1816). Malicious prosecution provides a remedy for harm caused by the institution or continuation of a criminal action that is baseless. *See Earl v. Winne*, 14 *N.J.* 119, 101 *A.2d* 535 (1953). Malicious use of process [9] is essentially the analog used when the

---

[9] Although there is a third, related cause of action, referred to as malicious abuse of process, *see Tedards v. Auty*, 232 *N.J.Super.* 541, 549–50, 557 *A.2d* 1030 (App.Div.1989), it is not germane to our analysis. The third party complaint included a count seeking relief on this basis, but the decision of the motion judge granting summary judgment on it has not been challenged on appeal.

offending action in question is civil rather than criminal. *See Penwag Prop. Co. v. Landau*, 76 *N.J.* 595, 597, 388 *A.*2d 1265 (1978); *Ash v. Cohn*, 119 *N.J.L.* 54, 57–58, 194 *A.* 174 (E. & A.1937). Although these causes of action have much in common, there are significant differences between them.

Malicious prosecution requires the plaintiff to prove four elements: (1) a criminal action was instituted by this defendant against this plaintiff; (2) the action was motivated by malice; (3) there was an absence of probable cause to prosecute; and (4) the action was terminated favorably to the plaintiff. *Lind v. Schmid*, 67 *N.J.* 255, 262, 337 *A.*2d 365 (1975). Although each factor is distinct, "evidence of one may be relevant with respect to another." *Ibid.* Nevertheless, each element must be proven, and the absence of any one of these elements is fatal to the successful prosecution of the claim. *Klesh v. Coddington*, 295 *N.J.Super.* 51, 58, 684 *A.*2d 530 (Law Div.), *aff'd*, 295 *N.J.Super.* 1, 684 *A.*2d 504 (App.Div.1996), *certif. denied*, 147 *N.J.* 580, 688 *A.*2d 1055 (1997); *see Penwag Prop. Co., supra*, 76 *N.J.* at 597–98, 388 *A.*2d 1265.

Malicious use of process requires the plaintiff to prove the civil counterpart to each of those elements, but adds a fifth requirement, namely, that the plaintiff has suffered a special grievance caused by the institution of the underlying civil claim. *Mayflower Indus. v. Thor Corp.*, 15 *N.J.Super.* 139, 152, 83 *A.*2d 246 (Ch.Div.1951), *aff'd*, 9 *N.J.* 605, 89 *A.*2d 242 (1952). The added special grievance requirement reflects the significantly different implications that flow from being sued in a civil matter as compared to being prosecuted on a criminal charge. *See Vickey v. Nessler*, 230 *N.J.Super.* 141, 148–49, 553 *A.*2d 34 (App.Div.), *certif. denied*, 117 *N.J.* 74, 563 *A.*2d 836 (1989). That is to say, the special grievance is designed to take the place of the injurious effects, including arrest, restraint, or the attendant humiliation of being held on bail, finger-printed, and photographed, that ordinarily flow from a wrongfully instituted criminal charge. *Id.* at 147, 553 *A.*2d 34. Because in contrast, the minimal impact of the commencement of civil litigation is insufficient on its own to

demonstrate an injury, the civil remedy of malicious use of process demands the additional showing of a special grievance. *Ibid.*

Our longstanding reluctance to permit parties to utilize these causes of action springs from our recognition that they carry with them the significant potential for abuse. Left unchecked, they create the possibility that a party will be forced to defend against one of these claims based on little more than having filed, and lost, in a court proceeding as to which the original defendant harbors resentment and anger. Decisions throughout all levels of our judiciary, including *LoBiondo I*, caution that the appropriate remedial uses of these causes of action must not become swallowed up by new efforts to utilize them to punish the exercise of rights by those who, in good faith, have sought redress in our courts. *See, e.g., Penwag Prop. Co., supra,* 76 *N.J.* at 598, 388 *A.*2d 1265 (relying on special grievance to achieve balance); *LoBiondo I, supra,* 323 *N.J.Super.* at 422, 733 *A.*2d 516 (cautioning about use of these claims to "impair accessibility"); *Tedards v. Auty,* 232 *N.J.Super.* 541, 549, 557 *A.*2d 1030 (App.Div.1989) (commenting on role played by special grievance to "distinguish between a plaintiff who is naïve and ... [one] who is a knave"); *Mayflower Indus., supra,* 15 *N.J.Super.* at 153, 83 *A.*2d 246 (referring to need for "[e]xtreme care" to avoid deterring legitimate suits).

## IV.

We confront a more complex set of questions than was considered by either of the appellate panels that have heard the dispute between these parties previously. The question before this Court is in some ways both broad and far-reaching, calling on us to decide questions of who shall bear the consequence of filing SLAPP suits and when it is appropriate to permit nonclients to demand recompense from another's lawyer. Seen more narrowly there are three questions before us. The first question is what are the proof requirements that will apply to each of the elements of the malicious use of process claim when it arises in the unique

circumstances of a SLAPP-back suit, asserted against the one who is alleged to have sought to silence the protestor. The second question is whether, in the SLAPP-back context, the one who allegedly sought to silence the protestor will be permitted to avail himself or herself of the defense of advice-of-counsel as it relates to the proofs on the element of probable cause. The final question is, if the one who allegedly sought to silence the protestor is permitted to rely on the advice-of-counsel defense, will a separate cause of action for malicious use of process lie as against the attorney who gave the advice relied upon. We consider each of these questions in turn.

## A.

First, we see little reason to abandon the basic analytical framework of the rights and remedies available to the parties involved in the SLAPP and SLAPP-back litigation that the Appellate Division utilized in *LoBiondo I.* More particularly, we agree with the court's essential reasoning to the effect that, in large measure, the traditional cause of action for malicious use of process well serves the role of affording a remedy to one who has been victimized by a SLAPP suit. In so concluding, we do not suggest that malicious use of process is any less a disfavored cause of action; rather, we conclude that, if a plaintiff who has allegedly been the victim of a SLAPP action can establish the traditional elements of malicious use of process, he or she should be permitted to do so, because that cause of action by its very nature will suffice to appropriately balance the rights of both parties.

That observation, however, does little to address the thornier question presented as to the proofs that we will require of such a plaintiff, or to answer the equally vexing matter of the availability of the defense of advice of counsel. Neither of those questions can fairly be addressed absent a recitation of how the elements of the traditional cause of action relate to the unique circumstances presented by a SLAPP-back suit. The dispute between the parties centers on only two of the elements of the cause of action,

namely, lack of probable cause and actuated by malice, but our analysis requires consideration of the special grievance element as well. We therefore examine each of these elements in turn.

We begin with probable cause, an element that has a well-established meaning arising in criminal law and therefore an equally plain meaning when used in the context of an action for malicious prosecution. When the cause of action is transformed into one based on a civil complaint, as in malicious use of process, the probable cause element could fairly be described as rather elusive. Probable cause is a matter of law to be determined by the court, and it is only submitted to the jury if the facts giving rise to probable cause are themselves in dispute. *Paul v. Nat'l Educ. Ass'n*, 195 *N.J.Super.* 426, 429, 480 *A.2d* 213 (App.Div.1984). Whether decided by the court or a jury, the inquiry into whether there was probable cause is determined by means of an objective analysis. *See Westhoff v. Kerr S.S. Co.*, 219 *N.J.Super.* 316, 321, 530 *A.2d* 352 (App.Div.), *certif. denied*, 109 *N.J.* 503, 537 *A.2d* 1292 (1987). The question to be decided is whether, in the prior suit, the facts supported the actor's "honest belief" in the allegations. *Ibid.*

In this context, honest belief means, using the reasonable prudent person standard, a reasonable belief that there was a good or sound chance of establishing the claim to the satisfaction of the court or the jury. *Id.* at 321–22, 530 *A.2d* 352 ("[Defendant] may rely on facts reasonably believed to be true and concerning which it might reasonably be expected that subsequent pretrial discovery would be supportive."). It has been held, for example, that "[r]easonable or probable cause for the institution of a civil suit is the presence of reasonable ground for belief that the cause of action exists supported by circumstances sufficient to warrant an ordinarily prudent man in the belief that it exists." *Mayflower Indus., supra*, 15 *N.J.Super.* at 153, 83 *A.2d* 246.

Malice, which has been described as a related element of the cause of action, is defined as the "intentional doing of a

wrongful act without just cause or excuse." *Jobes v. Evangelista,* 369 *N.J.Super.* 384, 398, 849 *A.*2d 186 (App.Div.), *certif. denied,* 180 *N.J.* 457, 852 *A.*2d 193 (2004); *see McFadden v. Lane,* 71 *N.J.L.* 624, 629–30, 60 *A.* 365 (E. & A.1905). It requires proof that the act was wrongful in the sense that it would, "in the ordinary course ... infringe upon the rights of another" and cause damage to that person's property or trade. *Mayflower Indus., supra,* 15 *N.J.Super.* at 153, 83 *A.*2d 246 (citation and internal quotation marks omitted). Legal "malice thus contemplated consists of the doing of the wrongful act in utter disregard of what the actor knew to be his duty, to the injury of another." *Duro Co. v. Wishnevsky,* 126 *N.J.L.* 7, 10, 16 *A.*2d 64 (Sup.Ct.1940). However, because our predecessor courts have concluded that even a wrongful act will be excused if founded on probable cause, *see McFadden, supra,* 71 *N.J.L.* at 630, 60 *A.* 365, we have permitted malice to be inferred from a finding that a defendant has neither probable cause nor a reasonable belief in probable cause, *see Jobes, supra,* 369 *N.J.Super.* at 398, 849 *A.*2d 186.

Historically, as it relates to the civil analog, judicial opinions addressing the quantum of proofs needed have recognized that, the less evidence of probable cause there is, the more likely it is that the original plaintiff was motivated by an impermissible, malicious intent. We have therefore recognized that proof of probable cause may be relevant to proof of malice. *See Lind, supra,* 67 *N.J.* at 262, 337 *A.*2d 365.

 Although in some ways that might appear to be rather circular, it simply means that, in an appropriate case, malice may be inferred from a lack of probable cause. *Earl, supra,* 14 *N.J.* at 134, 101 *A.*2d 535. Even so, it is not necessarily true that legal malice will be established merely by a lack of probable cause. *See Lind, supra,* 67 *N.J.* at 262, 337 *A.*2d 365. As our Appellate Division has noted, if the only evidence of a lack of probable cause was the inference derived from favorable termination of prior suit, some extrinsic evidence of malice will be required. *See Westhoff, supra,* 219 *N.J.Super.* at 323–24, 530 *A.*2d 352. Any contrary rule

would be unacceptable, because it would permit the claim for malicious use of process to succeed simply because the earlier matter was unsuccessful.

In like fashion, because the original plaintiff's reasonable belief that he or she had probable cause will defeat the cause of action entirely, reliance on the advice of counsel has long been recognized to be a complete defense. *See Weinstein v. Klitch*, 106 *N.J.L.* 408, 409–10, 146 *A.* 219 (E. & A.1929). On occasion, our predecessor courts concluded that even if, objectively, there was no probable cause for the complaint, reliance on the advice of counsel to the contrary will be sufficient because it will defeat the separate element of malicious intent. *See Sunderbrand v. Shills*, 82 *N.J.L.* 700, 703, 82 *A.* 914 (E. & A.1912).

The advice-of-counsel defense, however, has its own set of proof requirements. To claim its benefit, the original plaintiff must prove that he or she relied on counsel's advice and that the advice was given after a full and fair presentation to counsel of all of the relevant facts. *Weinstein, supra*, 106 *N.J.L.* at 409–10, 146 *A.* 219. "Full and fair" means disclosure to counsel of all information known to the original plaintiff that could justify or militate against the filing of the proposed cause of action. *Ibid.* In this context, if any of the facts so reported to counsel were known to the original plaintiff to be false, the advice-of-counsel defense will not operate as a shield against the claim. *See ibid.*; *cf. McFadden, supra*, 71 *N.J.L.* at 630, 60 *A.* 365.

The third traditional element of the cause of action that is in issue is the requirement that there be proof of a "special grievance." We have never regarded the mere cost of defending against litigation to suffice, but have equated this essential proof requirement with the "interference with one's liberty or property." *Penwag Prop. Co., supra*, 76 *N.J.* at 598, 388 *A.*2d 1265. In its analysis in *LoBiondo I*, the court described the usual barrier created by this element as "somewhat problematical." *LoBiondo I, supra*, 323 *N.J.Super.* at 423, 733 *A.*2d 516. In addressing it in the context of a SLAPP suit, the court concluded that the party

who is effectively silenced through the SLAPP action has been deprived of "liberty" because that concept embraces not a single right, but a "bundle of freedoms" of constitutional magnitude. *Id.* at 424, 733 *A.*2d 516. Those rights include not only the first amendment right to free speech, but the related right to petition the government. *Ibid.* Seen in the SLAPP suit context, the panel found room to conclude that being deprived of this bundle of rights could suffice to meet the special grievance requirement needed to proceed on the malicious use of process claim. *Ibid.* The court went further, however, commenting that if the affected person could demonstrate that the primary purpose of the SLAPP suit was to impair the exercise of that bundle of rights, the filing of the action would be "per se malicious." *Id.* at 423, 733 *A.*2d 516.

Although the broadest reading of the opinion might suggest a far-reaching cause of action, in fact, its impact has been relatively modest. Appellate Division decisions since *LoBiondo I* have not interpreted it expansively, but have instead given it limited application. *Baglini v. Lauletta,* 338 *N.J.Super.* 282, 301–03, 768 *A.*2d 825 (App.Div.) (concluding that effort to silence condo development objectors falls within *LoBiondo I* ), *certif. denied,* 169 *N.J.* 607, 782 *A.*2d 425, *appeal dismissed,* 169 *N.J.* 608, 782 *A.*2d 425 (2001); *see Turner v. Wong,* 363 *N.J.Super.* 186, 207–08, 832 *A.*2d 340 (App.Div.2003) (extending *LoBiondo I's* special grievance analysis to malicious prosecution action based on racial discrimination claim).

## V.

These traditional elements and defenses form an adequate framework for our analysis of the issues before us relating to LoBiondo, but they are of less assistance to us in deciding the questions that relate to the claims against the Giordano defendants. The question before us proceeds beyond the mere filing of the cause of action against LoBiondo and even beyond his assertion of the defense of advice of counsel. Instead, this matter calls

upon us to consider what, if any, cause of action will lie against the original plaintiff's attorney when the advice-of-counsel defense is asserted. This largely, although not entirely, uncharted territory requires our separate consideration.

## A.

We can only adequately consider whether an individual who has asserted a claim for malicious use of process against the party who filed the underlying action may also assert such a claim against that party's lawyer, and what the required proof elements of such a cause of action would be, within the larger context of the ways in which we govern the professional behavior of attorneys.

Our principal means of regulating the behavior of attorneys are found in our *Rules of Professional Conduct* (*RPC*) and the disciplinary system that we use to enforce them. That system, which provides the Court with a variety of sanctions through which we police the practice of law, and which permits the filing of ethics complaints, may be initiated by clients and nonclients alike. Two of our *RPCs* are relevant to the assertions raised in this appeal. The first, *RPC* 3.1, provides in pertinent part as follows:

A lawyer shall not bring or defend a proceeding, nor assert or controvert an issue therein unless the lawyer knows or reasonably believes that there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification, or reversal of existing law, or the establishment of new law.

That rule, in one form or another, has long been a part of the ethical code that guides attorneys in the practice of law. Although we need not reiterate the standard against which we evaluate an attorney's intent for purposes of this *RPC*, we note that it was adopted after considerable debate, and that it abandoned the purely subjective test utilized by the predecessor Disciplinary Rule. *See State v. Rue*, 175 *N.J.* 1, 18, 811 *A.2d* 425 (2002).

The second ethical rule that is relevant to this appeal is *RPC* 4.4(a), which provides:

In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.

Taken together, *RPC* 3.1 and *RPC* 4.4(a) impose on all attorneys the "ethical requirement of a good faith belief in an actionable claim," *Mancuso v. Neckles ex rel. Neckles*, 163 *N.J.* 26, 36–37, 747 *A.2d* 255 (2000), and the obligation to refrain from pursuing litigation for an improper purpose. We have not hesitated to impose discipline upon attorneys whose behavior runs afoul of these rules. *See, e.g., In re Harris*, 182 *N.J.* 594, 606–07, 868 *A.2d* 1011 (2005) (sanctioning attorney for filing pleading in defiance of court order); *In re Vincenti*, 152 *N.J.* 253, 278, 704 *A.2d* 927 (1998) (sanctioning counsel for filing pleadings after removal from representation).

In addition to the *RPCs*, however, we have adopted a further mechanism, *Rule* 1:4–8, which is designed to ensure that attorneys do not initiate or pursue litigation that is frivolous. The *Rule*, which is comprehensive, includes several provisions relevant to this matter. First, the *Rule* imposes an obligation on the attorney or party pro se to certify, based on a reasonable inquiry, that the pleading "is not being presented for any improper purpose," that the assertions "are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law," and that there is "evidentiary support" for the allegations being made. *R.* 1:4–8(a)(1), (2), (3). Second, the *Rule* imposes a continuing duty on the attorney or party pro se who filed the pleading to correct or withdraw the allegations or the denials contained therein based upon further investigation and discovery. *R.* 1:4–8(a)(3), (4). Third, it creates an enforcement mechanism by which a party who believes that a pleading or filing violates the *Rule* may so advise the adversary, giving the adversary the opportunity to withdraw the pleading without penalty, failing which, that party may seek or the court may impose a variety of sanctions. *R.* 1:4–8(b)(1).

The sanctions created in *Rule* 1:4–8 are specifically designed to deter the filing or pursuit of frivolous litigation and to address that

conduct in two ways. First, after final judgment in the matter, the party adversely affected by the frivolous pleading may be awarded "reasonable expenses and attorneys' fees incurred in presenting or opposing the motion [for judgment on the merits]." *R.* 1:4–8(b)(2). In addition, the court may act independently of any request for relief by the adverse party, *see R.* 1:4–8(c), and may impose sanctions on the offending attorney or party pro se, *see R.* 1:4–8(d). The sanctions that are permitted to be awarded, however, are not unbounded, but are specifically described as "a sum sufficient to deter repetition of such conduct." *Ibid.* More particularly, the *Rule* describes the permissible sanction in terms of "pay[ment of] a penalty into court, ... payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation, or both." *Ibid.* As a means to ensure that it does not simply become an avenue for the routine award of attorneys' fees, the *Rule* requires the court, as part of its order, to "describe the conduct determined to be a violation of this rule and explain the basis for the sanction imposed." *Ibid.* Moreover, the Appellate Division has noted that the *Rule* imposes a temporal limitation on any fee award, holding that reasonable fees may be awarded only from that point in the litigation at which it becomes clear that the action is frivolous. *DeBrango v. Summit Bancorp,* 328 *N.J.Super.* 219, 229–30, 745 *A.*2d 561 (App.Div.2000) (interpreting impact of obligation to withdraw based on further discovery pursuant to *R.* 1:4–8(a)(3) upon award of fees).

Although we have not addressed the parameters of this *Rule,* our Appellate Division has been consistent in its strict application. *See, e.g., First Atl. Fed. Credit Union v. Perez,* 391 *N.J.Super.* 419, 433, 918 *A.*2d 666 (App.Div.2007) (concluding that objectively reasonable belief in merits precludes attorney fee award); *Wyche v. Unsatisfied Claim and Judgment Fund,* 383 *N.J.Super.* 554, 560–61, 892 *A.*2d 761 (App.Div.2006) (holding that plaintiff's legitimate effort to extend law on previously undecided issue precluded award of fees); *K.D. v. Bozarth,* 313 *N.J.Super.* 561, 574–75, 713 *A.*2d 546 (App.Div.) (declining to award attorneys' fees where

plaintiff had reasonable and good faith belief in merits of claim), *certif. denied,* 156 *N.J.* 425, 719 *A.*2d 1023 (1998).

Nevertheless, in appropriate circumstances, our Appellate Division has concluded that the *Rule* was violated and has upheld awards of fees and sanctions. *See, e.g., Port–O–San Corp. v. Teamsters Local Union No. 863 Welfare & Pension Funds,* 363 *N.J.Super.* 431, 439, 833 *A.*2d 633 (App.Div.2003) (finding violation for joinder as defendant of party known to have no liability); *White v. Karlsson,* 354 *N.J.Super.* 284, 290, 806 *A.*2d 843 (App. Div.) (concluding that answer that asserted defenses without reasonable investigation violated *Rule* ), *certif. denied,* 175 *N.J.* 170, 814 *A.*2d 635 (2002); *Hreshko v. Harleysville Ins. Co.,* 337 *N.J.Super.* 104, 110–11, 766 *A.*2d 776 (App.Div.2001) (finding, in underinsured motorist action, that joinder of all persons involved in accident, irrespective of fault, would have violated *R.* 1:4–8).

This framework provides the courts and parties with powerful and effective tools for ensuring that attorneys file and pursue litigation in good faith and for its proper purposes; it creates the backdrop for our consideration of whether, and under what circumstances, a direct cause of action against an attorney for malicious use of process will lie.

B.

This is not the first time that we have considered the propriety of permitting a direct claim against an attorney by a nonclient. We have traditionally been reluctant to permit a nonclient to sue an adversary's attorney, and with good reason. We have long recognized that an attorney owes a duty of zealous representation to his or her client, *see RPC* 1.2, 1.3, and although we have commented on the tension that fidelity to that duty may create, *see Brundage v. Estate of Carambio,* 195 *N.J.* 575, 597, 951 *A.*2d 947 (2008), we have endeavored to make certain that an advocate will be able to faithfully, fully and zealously represent his or her client without fear of reprisal from others. Our reluctance to permit nonclients to institute litigation against attorneys who are

performing their duties is grounded on our concern that such a cause of action will not serve its legitimate purpose of creating a remedy for a nonclient who has been wrongfully pursued, but instead will become a weapon used to chill the entirely appropriate zealous advocacy on which our system of justice depends.

We have been mindful of the theoretical limits that constrain recognition of any such cause of action. The absence of a direct relationship between an attorney and a nonclient ordinarily negates the existence of any duty and, by extension, affords no basis for relief. The requirement that there be an underlying duty to the nonclient, as a practical matter, has limited the circumstances in which a nonclient may file suit against another's attorney to relatively few situations.

We first permitted a cause of action on behalf of a nonclient in *Petrillo v. Bachenberg*, 139 *N.J.* 472, 655 *A.*2d 1354 (1995), in which the buyer of real estate received a misleading test report from the seller's attorney and relied on it in making the purchase. We there recognized that in some circumstances an attorney knows or reasonably should know that a nonclient will rely on the attorney's representation or opinion, and concluded that this should give rise to a limited duty. *Id.* at 483–84, 655 *A.*2d 1354.

Before reaching our decision, we canvassed our own precedents, to carefully balance the attorney's duties to the client against the potential duty to the nonclient. *Id.* at 479–80, 655 *A.*2d 1354. We then considered our system of discipline to determine whether recognizing a remedy in favor of a nonclient would conflict with or supplement those deterrents. *Id.* at 479, 655 *A.*2d 1354. Finally, we turned to other sources for further persuasive support, including decisions published in other jurisdictions and scholarly commentaries. *Id.* at 480–82, 655 *A.*2d 1354. In the end, we concluded that the rule expressed in the *Restatement (Third) of the Law Governing Lawyers* that would permit such a suit was consistent with our established jurisprudence. *See Petrillo, supra,* 139 *N.J.* at 483–84, 655 *A.*2d 1354. In announcing the rule, however, we included strong cautionary language to prevent the abuse of the

remedy: "[n]o matter how expressed, the point is to cabin the lawyer's duty, so the resulting obligation is fair to both lawyers and the public." *Id.* at 484, 655 *A.*2d 1354.

Although groundbreaking, the rule announced in *Petrillo* has been applied rather sparingly, *see Pivnick v. Beck,* 165 *N.J.* 670, 671, 762 *A.*2d 653 (2000). It is not, however, the only basis on which we have recognized the potential for a direct claim against an attorney by a nonclient. We have, for example, considered and authorized in principle a claim against an attorney who participated in a civil conspiracy with the goal of assisting a client to engage in a fraudulent transfer of assets to the detriment of a lender. *See Banco Popular N. Am. v. Gandi,* 184 *N.J.* 161, 177–78, 876 *A.*2d 253 (2005).

 We there focused on the well-established elements of a civil conspiracy, that is, the " 'combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or an injury upon another, and an overt act that results in damage.' " *Id.* at 177, 876 *A.*2d 253 (quoting *Morgan v. Union County Bd. of Chosen Freeholders,* 268 *N.J.Super.* 337, 364, 633 *A.*2d 985 (App. Div.1993), *certif. denied,* 135 *N.J.* 468, 640 *A.*2d 850 (1994)). We recognized that if the attorney encouraged and assisted the client in a violation of the Uniform Fraudulent Transfer Act, *N.J.S.A.* 25:2–20 to –34, the victimized bank could pursue the attorney. *Banco Popular, supra,* 184 *N.J.* at 178, 876 *A.*2d 253. Moreover, we commented "[t]he fact that [the lawyer] was representing [the client] during that transaction does not insulate him from liability." *Ibid.* (citing *Wahlgren v. Bausch & Lomb Optical Co.,* 68 *F.*2d 660, 664 (7th Cir.), *cert. denied,* 292 *U.S.* 639, 54 *S.Ct.* 774, 78 *L.Ed.* 1491 (1934)). We therefore recognized that there are circumstances, including an attorney's acts to encourage and assist the client in wrongdoing, that could directly injure the nonclient and that would support an independent remedy. *Id.* at 177–78, 876 *A.*2d 253.

Even so, there remain relatively few grounds on which a nonclient may sue an attorney. Our disciplinary rules and our frivolous litigation sanctions have been effective in controlling the behavior of attorneys, without also permitting anyone to pursue separate causes of action based thereon. *See Baxt v. Liloia*, 155 *N.J.* 190, 198–99, 714 *A.2d* 271 (1998). We are confident that these tools have vastly limited the situations in which a direct cause of action might be warranted. Few members of the bar, knowing the force of the disciplinary sanctions under the *RPCs* or the potential costs they face under *Rule* 1:4–8, engage in the sorts of baseless litigation that would also call for the creation of a remedy available through a direct cause of action. The question before the Court in this matter is whether the circumstances in this appeal represent one of them.

It is within this broader context that we must consider the matter now before us, separately and to some extent independently evaluating the elements of the cause of action for malicious use of process as they might relate to LoBiondo and as they might give rise to a cause of action against his attorneys.

## VI.

In spite of the passage of time since the decision in *LoBiondo I*, the factual allegations of the Schwartz counterclaim have not been tried, having been dismissed by the grant of summary judgment. Curiously, the facts presented in the original LoBiondo lawsuit were tried to a jury and, at least as against Schwartz and one of her daughters, that lawsuit was successful. Neither the small awards to her two other daughters on the counterclaim nor the appellate panel's conclusion in *LoBiondo I* that the original complaint should have been dismissed, however, entitles her to recover. That outcome does not demonstrate "absence of probable cause," or "actuated by malice," or special grievance. Those facts therefore do not relieve Schwartz of the burden of proving each element of the claim for malicious use of process; they merely demonstrate that the prior matter ended in her favor. We take

this opportunity, therefore, to explain in some detail the manner and levels of proofs that must be presented by Schwartz [10] in order to prevail on her claim, both as to LoBiondo and as to his attorneys.

First, we agree in principle that malicious use of process should be available as a SLAPP suit remedy. To the extent that a SLAPP suit victim can marshall the requisite proofs for the cause of action, we will not prohibit it. Second, part and parcel of that cause of action is the advice-of-counsel defense and we see no basis on which to eliminate that defense. Third, our balancing of all of these considerations compels us to conclude that, where the advice-of-counsel defense is raised, the nonclient may also seek relief through the vehicle of a cause of action for malicious use of process against the attorney involved in the SLAPP suit.

Our decision to permit the nonclient to proceed against the attorney is a limited one; as in *Petrillo*, we consider it to be a fair balancing of the rights and duties owed to one's own clients and to others. And as in *Petrillo*, we conclude that the elements of the cause of action themselves will sufficiently cabin in the claim so that it will neither supplant nor replace the remedies found in the *RPCs* or in *Rule* 1:4–8, but that it will be preserved for those rare instances in which a remedy is appropriate. That is, we recognize that there may be situations in which the sanctions embraced by our disciplinary system that deter or regulate conduct will be insufficient to remedy affirmative damage done to a nonclient, and we limit the cause of action accordingly. More to the point, we limit the cause of action to the circumstance in which the client has first raised the defense of advice of counsel in order to prevent the claim from being used for purposes of creating an adverse relationship between counsel and client. Because we recognize that the attorney's first duty is to zealously represent the client, and because an attorney faced with a claim of malicious use of

---

[10] For purposes of this aspect of our discussion, our references to Schwartz include Mrs. Schwartz and her three daughters.

process may as a practical matter be unable to mount a defense by reason of the bounds of confidentiality or privilege, we limit the grounds for the claim to those in which the client has already called the attorney's advice into issue. Fairness demands no less.

In addition, we are mindful that even recognizing the existence of a cause of action against the attorney by the nonclient carries with it a risk of abuse. The risk, of course, is that the claim will be made not because it is warranted, but as a litigation tactic designed to drive a wedge between client and counsel or to disqualify counsel from the case. That risk, however large or small, compels us to adhere to our usual requirement that a claim for malicious use of process be brought only after the underlying matter has been concluded. *Penwag Prop. Co.*, *supra*, 76 *N.J.* at 598, 388 *A.*2d 1265. Although we recognize the efficiency that would flow from a contrary rule, *see LoBiondo I, supra*, 323 *N.J.Super.* at 424–25, 733 *A.*2d 516, the specter of a unified suit in which the attorney is forced into the dual roles of advocate and party overcomes any potential efficiency. *See Olds v. Donnelly*, 150 *N.J.* 424, 448, 696 *A.*2d 633 (1997) (concluding that legal malpractice claims should be exempt from entire controversy doctrine as we "endeavor . . . to temper efficiency with individual justice").

## VII.

We turn to our analysis of how those broad principles relate to the claims against LoBiondo. First, although there may be some overlap in the proofs, there can be no recovery against him absent proof of each of the traditional elements of malicious use of process. That is, in order to prevail, Schwartz and her daughters must demonstrate that the original claim against them was brought with the "absence of probable cause"; that it was "actuated by malice"; that it terminated in their favor; and that they suffered a special grievance. In the context of the claim against LoBiondo, only the elements of the original filing and its favorable termination are undisputed; each of the others must be proven.

The only debate on appeal as to how these factors relate to LoBiondo is the one centered on the advice-of-counsel defense and the way in which the Appellate Division articulated the elements that LoBiondo must prove to claim the benefit of that defense. We have long recognized the viability of this defense; demonstrating that the attorney advised that there was probable cause to file the original complaint operates as an absolute defense to malicious use of process. *Weinstein, supra,* 106 *N.J.L.* at 409–10, 146 *A.* 219. As part of that defense, the party must do more than show that an attorney "signed off" on the complaint. Instead, the client must show that he or she gave the attorney all of the facts on which an informed decision could be made. We have concluded that in those circumstances, regardless of the client's purpose in pursuing the litigation, it erases the "absence of probable cause" element of the tort of malicious use of process and that without that critical element, there can be no recovery. *Ibid; see Lind, supra,* 67 *N.J.* at 262–63, 337 *A.*2d 365.

Our evaluation of these well-established precedents compels us to reject LoBiondo's request that we apply a purely subjective test that would shield him if he simply believed that his disclosures were accurate and complete. Such a rule would effectively prevent any claim, however legitimate, from succeeding because, as a practical matter, it would be impossible to overcome the defense. Nonetheless, applying our traditional test, we are compelled to agree with him that the appellate panel erred in concluding that there were issues to be tried concerning the completeness of his disclosures to counsel. We reach this conclusion for two reasons. First, to some extent, it appears that the appellate panel may have concluded that the *LoBiondo I* decision itself sufficed to demonstrate that the original complaint was filed without probable cause, a finding for which there is no support. In spite of some of the views expressed in *LoBiondo I*, the record reflects that there is a debate about the merits of the original complaint. For purposes of the malicious use of process complaint, all that the *LoBiondo I* decision demonstrates is that the

original matter terminated in favor of Schwartz; it cannot be equated with the required element of "absence of probable cause." To the extent that the panel in *Lobiondo II* deprived LoBiondo of the advice-of-counsel defense because of any contrary view, it erred.

Second, we reach our conclusion because, as LoBiondo correctly notes, the test utilized by the Appellate Division in its evaluation of the advice-of-counsel defense was in error. The record leaves no doubt that LoBiondo turned over to his attorneys all of the documentary evidence he attributed to Schwartz, and that he presented counsel with all of the other facts that were relevant to his attorneys' evaluation about probable cause. The panel, however, concluded that "full and fair disclosure" also demanded that LoBiondo disclose his motivations for seeking the attorneys' assistance in the litigation, and its remand was largely focused on the issue of whether he was completely truthful about his reasons for seeking to sue Schwartz and her daughters.

In that, we agree that the test applied went too far, because the focus of the advice-of-counsel defense is on probable cause and on whether the client told the attorney the information relevant to that analysis. In evaluating probable cause, the test is an objective and fact-based one; an evil motive, therefore, is not relevant to the analysis of whether the facts gave rise to probable cause or to the assertion of the advice-of-counsel defense.

Because we agree with LoBiondo that the Appellate Division's articulation of the elements of the advice-of-counsel defense was in error, and because our review of the record makes plain that his factual disclosures to counsel were full and fair, we reverse the judgment of the Appellate Division as to LoBiondo.

## VIII.

We turn, then, to the thorniest question: whether, and if so on what grounds, Schwartz may also pursue LoBiondo's lawyers. In theory, of course, if LoBiondo told the lawyers everything and if

the lawyer advised him that there was probable cause for filing his suit against Schwartz, and if neither had an evil motive, then even if the lawsuit failed, there could be no recovery against either of them. Conversely, if LoBiondo withheld critical factual information from the attorney that would have demonstrated a lack of probable cause, LoBiondo would not be able to sustain his proofs under the advice-of-counsel defense and he alone would be liable to Schwartz. Notwithstanding the foregoing, we agree that there are situations in which the attorney may be liable to the nonclient directly, and it is to an explanation of those circumstances that we now turn.

Our analysis of whether Schwartz could prevail as against the Giordano defendants is informed by our more general framework relating to attorneys, attorney discipline, and permissible suits by nonclients that we have explained. Critical to our analysis is the recognition that our mechanisms for discipline are ordinarily effective in achieving a right balance between the duty owed to one's client, which is paramount, and the lesser duties owed to others, including the tribunal and nonclients. That being the case, it is only in those few circumstances where there is a duty owed to a nonclient that the potential for an independent claim will arise. Even then, as we recognized in *Petrillo*, we must be careful to "cabin" the claim so as not to interfere with the essential duty of representing one's client both zealously and without fear of reprisal.

Viewed in the context of our need to carefully balance those duties, we are persuaded that, in some circumstances, permitting a nonclient to pursue a claim for malicious use of process against an adversary's attorney should be authorized. Indeed, it is the very elements of that claim, as they must be proven against an attorney, that will sufficiently "cabin" the cause of action to avoid the kind of imbalance that would threaten the independence and zealousness of counsel. It is, therefore, to those elements, that we now turn.

When considering the claim that targets the attorney, the ordinary elements of the tort must be independently analyzed. As with our discussion of the parameters of the tort historically and in the context of the claim against the client, the critical elements are that the matter was filed with an "absence of probable cause," that it was "actuated by malice," and that the nonclient suffered a special grievance. In the unique context of the nonclient's claim against the attorney, whether there was probable cause to initiate the complaint will begin with the facts made known to the attorney by his or her own client and those learned by the attorney in his or her investigation. The probable cause analysis will be based on the attorney's evaluation of those facts as against existing law or a reasonable good faith extension of the law. In the ordinary case, that evaluation will be the sort of neutral, detached decisionmaking engaged in by any like professional. As a result, because the attorney has no pre-existing connection with the nonclient, an absence of probable cause does not necessarily bespeak the existence of malice. Instead, that element must be separately proven.

The evaluation of the element of "actuated by malice" is more complex. In order to determine whether the nonclient can sustain his or her burden of proof on this element of the cause of action, the court must look to the motivation of the attorney, rather than to the motivation of the client. Although the two may overlap, and although in some circumstances the motivation of the client may be attributed to the attorney, this will not always be the case. As a result, simply because the client had an evil motive and simply because the attorney filed the lawsuit while aware of that motive, this will not be enough to prove that the attorney necessarily shared in or even intended to assist in the accomplishment of that motive. Indeed, if the attorney reasonably believes that there is probable cause to file the action, there would be no reason to attribute the client's motive to the attorney. Instead, the evaluation of this essential element of proof requires an inquiry into the attorney's motive for filing the litigation.

As we have seen, our traditional view of what is meant by the element "actuated by malice" includes concepts such as the "intentional doing of a wrongful act without just cause or excuse," *Jobes, supra,* 369 *N.J.Super.* at 398, 849 *A.*2d 186, and the "doing of the wrongful act in utter disregard of what the actor knew to be his duty, to the injury of another," *Duro, supra,* 126 *N.J.L.* at 10, 16 *A.*2d 64. In a similar context arising in the tort of trespass as it related to the behavior of an attorney, it has been held that as long as the attorney "acts merely in his character of attorney, making use of the process of the law to enforce his client's demand, . . . he is not amenable to suit." *Schalk v. Kingsley,* 42 *N.J.L.* 32, 33 (Sup.Ct.1880). Nevertheless, just as the lawyer who merely in good faith and without any evil motive assists his client's cause cannot be liable to another, the lawyer who does so without probable cause and if "actuated by malice" will find no shield in our law. We turn, then, to the question of what we mean by "actuated by malice" when the target of the litigation is the attorney.

Our explanation of our common law causes of action demonstrates that they are not sufficient on their own to answer the question presented. As a result, and as part of our effort to ensure that the rule that we announce will complement rather than supplant our well established mechanisms for discipline and regulation of the practice of law, we have considered, and we find useful, the analytical framework set forth in section 57 of the *Restatement (Third) of the Law Governing Lawyers.*[11] *See, e.g., A. v. B.,* 158 *N.J.* 51, 61–63, 726 *A.*2d 924 (1999) (finding *Restatement (Third) of the Law Governing Lawyers* § 112, comment 6 of Proposed Final Draft No. 1 persuasive after analysis of multiple alternate sources of guidance on scope of attorney's duty of confidentiality); *McKeown–Brand v. Trump Castle Hotel & Casino,* 132 *N.J.* 546, 557, 626 *A.*2d 425 (1993) (citing *Restatement*

---

[11] The *Restatement (Third) of the Law Governing Lawyers* was preceded by numerous published drafts and proposals, but is the only version adopted and published by the American Law Institute.

*(Third) of the Law Governing Lawyers* § 141 of Draft No. 5 for general rule about relationship between client and counsel).

Section 57(2) is notable because it explains the circumstances in which an attorney will not be liable to a nonclient, rather than cataloging what behavior of the attorney will be actionable. It provides in relevant part that the attorney will be shielded "if the lawyer has probable cause for acting, or if the lawyer acts primarily to help the client obtain a proper adjudication of the client's claim in that proceeding." *Restatement (Third) of the Law Governing Lawyers* § 57(2) (2000). The comments express a preference to shield the attorney from suits by nonclients and sets forth a rationale consistent with our analysis of the balance of duties. That is, the authors recognize that allowing such suits "could discourage lawyers from representing clients with proper vigor and thus impede the access of litigants to court." *Id.* comment b. Similarly, the authors note that "the adversary system itself . . . [and] the tribunal's power to govern the conduct of lawyers" both operate to decrease the risk of improper use of the courts that might otherwise be addressed through such means as a claim for malicious use of process. *Ibid.* Nevertheless, by implication, the rule would permit a cause of action against an attorney who falls outside of the rather broad shield that the *Restatement* embraces. Notably, the *Restatement* rule, like our own precedents, is expressed in the disjunctive, so that an absence of proof on any one of the elements will be fatal. That is, the *Restatement* rule provides that probable cause will be a complete defense, and that, even in the absence of probable cause, where the attorney is acting primarily to obtain a "proper adjudication" of the client's case, he will not be liable to the nonclient. *Id.* § 57(2).

Although the phrase "a proper adjudication of the client's claim" is not separately defined, the commentary to the section provides some illumination of the concept. It states in relevant part:

[R]egardless of the client's purpose, even if a lawyer "has no probable cause and is convinced that his client's claim is unfounded, he is still not liable [for wrongful use of civil proceedings] if he acts primarily for the purpose of aiding his client in

obtaining a proper adjudication of his claim" .... A desire to earn a contingent or other fee does not constitute an improper motive. *But if a lawyer acts without probable cause "and for an improper purpose, as, for example, to put pressure upon the person proceeded against in order to compel payment of another claim of his own or solely to harass the person proceeded against by bringing a claim known to be invalid, he is subject to the same liability as any other person"* .... The lawyer's motive is assessed separately from that of the client. However, the client's motives, if known to a lawyer, may constitute evidence bearing on the lawyer's motives.

[*Restatement (Third) of the Law Governing Lawyers, supra*, § 57 comment d (emphasis added) (alterations in original) (quoting *Restatement (Second) of Torts* § 674 comment d (1977); citing *id.* § 676).]

In some measure, this aspect of the *Restatement (Third) of the Law Governing Lawyers* is derived from the *Restatement (Second) of Torts*, where the torts of malicious use of process and malicious abuse of process are explained. As a result, the *Restatement* authors intended to embrace within this concept the notion that there can only be a tort if the improper purpose is the primary one. *Restatement (Second) of Torts, supra*, § 674(a) (requiring proof that matter be initiated "without probable cause, and primarily for a purpose other than that of securing the proper adjudication of the claim").

The *Restatement (Second) of Torts* separately considers the purpose of the original litigation, again concluding that there will only be liability if the primary purpose was "other than that of securing the proper adjudication of the claim." *Id.* § 676. There is no definition provided for "primary" and no clear meaning ascribed to it. Instead, the *Restatement* addresses the "propriety of purpose" through a series of examples, each of which makes plain that primary means principal or essential; in explaining the concept, the authors refer as well to situations in which the element of proofs is met because the sole purpose is an improper one. *Id.* comment c.

Although not explicitly embraced in section 57 of the *Restatement (Third) of the Law Governing Lawyers*, there is, perhaps, some light shed on the concept of a primary improper purpose in section 682 of the *Restatement (Second) of Torts*, explaining the separate tort of malicious abuse of process. The commentary to

that section provides that the improper purpose must be the primary one and not merely incidental to the permitted purpose, and refers to it as "an immediate purpose." *Id.* § 682 comment b. We find in these explanations a meaning that is consistent with our own established precedents. That is, we understand the phrase to mean a purpose that is the principal, essential, immediate and overriding one rather than one that is merely incidental or corollary in nature.

Therefore, assuming that there has been a showing of no probable cause, these concepts inform our evaluation of the proofs required about the attorney's motive for filing the litigation. Consistent with these principles, in order to demonstrate that the attorney's actions were "actuated by malice," the nonclient must demonstrate that the attorney's primary purpose was an improper one. In that analysis, the purpose may be the attorney's entirely separate one, or it may be one that is shared with the client, but it must be the primary purpose for filing the matter and it must be a purpose of the attorney rather than simply the purpose of the client. *Restatement (Third) of the Law Governing Lawyers, supra,* § 57 comment d.

Therefore, an attorney who only knows, or who reasonably believes, that a client wants to file the suit to clear his name, and who, knowing of no other purpose of the client, files it only for the motivation of retaining a good client or earning a fee cannot be said to have acted from an improper purpose. If that suit was baseless, the attorney may be subject to discipline or to sanctions pursuant to *Rule* 1:4–8, but the nonclient will not be able to prove that the matter was actuated by malice. Similarly, an attorney who knows that the client harbors hatred for the opponent but reasonably believes that the suit could succeed to clear his client's name or repair damage to his business, will not have acted for an improper purpose if his primary purpose for filing the matter was not the improper one. In that circumstance, even if the client's primary motive was an evil one, the attorney's was not. Therefore, if the attorney's primary motive was to earn a fee, then

even if the attorney is aware of the client's malicious motive, the attorney will not be liable to the nonclient for malicious use of process. Instead, the appropriate remedy for that action will be the imposition of sanctions or discipline.

On the other hand, if an attorney, knowing the litigation is baseless and that the client intends to pursue it only for the improper purpose of harassing, silencing or intimidating the nonclient, proceeds for that reason primarily, so as to make that improper purpose the attorney's own, he or she should not escape the consequences of that choice. In that circumstance, the client and the attorney will both share in liability to the nonclient for the consequence of their joint endeavor. That is to say, we do not agree with the comment in *LoBiondo I* to the effect that if the original complaint can be described as a SLAPP suit its filing is per se malicious. As it relates to the attorney, there must still be proof that the primary purpose in filing the complaint was an improper one. Finally, if an attorney knows that a claim is baseless, but informs the client that it has merit solely because the attorney has his or her own evil motive to harm the nonclient, perhaps arising from a long-held personal grudge unknown to the client, then the attorney but not the client will have the improper motive required to support the cause of action for malicious use of process. In that presumably rare circumstance, the client will be exonerated through the advice-of-counsel defense and the attorney alone will be liable to the nonclient, inasmuch as the evil intent and the primarily improper purpose was the attorney's alone.

There is a third element of proof that bears discussion, because in order to prevail on a malicious use of process claim, there must be proof of a special grievance. Although this is true regardless of whether the focus is the adversary or the attorney, it is of particular importance to our evaluation when the claim is made against the attorney. It is the existence of a special grievance that takes the claim out of the realm of behaviors for which discipline or sanctions will suffice. Therefore it is only when a nonclient can prove that the attorney's filing of the complaint

caused a special grievance that we will permit the cause of action by the nonclient against the attorney. In the absence of a special grievance, the possibility that the cause of action that we now recognize will be abused is all too real, and it is for this reason that special grievance is an essential element of the proofs.

■ For this purpose, although we agree with much of the holding of *LoBiondo I* that the victim of a SLAPP suit can prove a special grievance because of the "bundle of freedoms" that the suit was designed to interfere with, simply calling the initial claim a SLAPP suit will not be enough to carry the burden of proving a special grievance. Instead, in order to prevail, the plaintiff in the SLAPP-back suit must demonstrate that he or she indeed suffered the special grievance by demonstrating that those essential rights included in the "bundle" to which the *LoBiondo I* court pointed were infringed. Absent such evidence, a malicious use of process plaintiff cannot demonstrate the requisite "special grievance" that is fundamental to the cause of action. The special grievance must be a real one, not just a convenient label affixed so as to relieve the party of one of the essential elements of the cause of action. To the extent that the discussion of special grievance in *LoBiondo I* suggested anything less, we do not embrace it.

■ Those principles and our explanation of the bases on which they are founded form the framework of the test that will apply to an attorney who is accused of having engaged in malicious use of process. In reaching our decision, we reject the broad call issued by Schwartz for a wide ranging or open-ended cause of action against an attorney by a nonclient who believes that there may have been a malicious use of process, and we also reject the Appellate Division's rearticulation of the *Restatement* test. Nonetheless, as it applies to the Giordano defendants, our test compels us to conclude, as did the Appellate Division, that the claim against them cannot succeed.

To be sure, some of the elements that we have required are obvious in this record. That is, our conclusion that the claim be available only if raised by the client through the assertion of the

advice-of-counsel defense has been met, and our usual require-
ment that the original matter be ended, as a practical matter, has
been satisfied as well. Others might be open to debate, as with
whether Schwartz actually suffered a special grievance or, poten-
tially, whether there was probable cause. In the end, however,
there is no support in the record on the required element of malice
as it relates to the Giordano defendants. All of the evidence,
revealed during discovery after the remand, on the subject of the
attorneys' motivations demonstrates that their primary purpose
was a proper one. All of the evidence about the reasons why they
filed the complaint points to a good faith belief that their client
and his business had been damaged, that the conduct engaged in
by the defendants that they named in the complaint was wrongful,
and that the claim was made for no improper purpose. Because
Schwartz would have to prove that the primary purpose of the
Giordano defendants was an improper one, and because there is
no support in the record for that conclusion, we agree with the
Appellate Division that the claim as against the Giordano defen-
dants was properly dismissed.

Even though we have found no basis for permitting the claim as
against these attorneys to proceed, we are not unmindful of the
potential that our recognition of the viability of this cause of action
may have in terms of creating tension between client and attorney.
Nor are we unaware of the risk that it will become a sword
utilized in an effort to drive a wedge between client and counsel or
to force counsel to withdraw or be disqualified. Although we are,
of course, reluctant to authorize any cause of action with the
potential for abuse, and although we continue to believe that our
usual mechanisms for addressing attorneys and their behavior will
ordinarily suffice, we also recognize that the cause of action, with
the specific proof requirements that we now demand, will be
carefully circumscribed. In particular, by our definition of the
elements of "absence of probable cause," "actuated by malice," and
"special grievance" that must be separately proven as to the
original client and as to the attorney, we are confident that the
claim will only succeed in those rare instances in which an

individual has been affirmatively harmed by behavior that falls within the parameters of the tort.

## IX.

The judgment of the Appellate Division dismissing the malicious use of process claim against the Giordano defendants is affirmed as modified. The judgment of the Appellate Division reinstating the malicious use of process claim as to the LoBiondo parties is reversed.

*For affirmance in part as modification/reversal in part*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.